810 F.2d 879
 UNITED STATES of America, Plaintiff-Appellee,
v.
Hector ALVAREZ, Defendant-Appellant.
 No. 83-5208.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 7, 1986.
Decided Feb. 17, 1987.
As Amended Feb. 17, 1987.
 
 Allan Ides, Los Angeles, Cal., for defendant-appellant.
 Jimmy Gurule, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before CANBY, REINHARDT and NOONAN, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 Hector Alvarez appeals his conviction for possession of cocaine with intent to distribute and for conspiracy, 21 U.S.C. Secs. 841(a)(1), 846. He contends that the district court erred when it denied his motion to suppress certain statements and physical evidence obtained after his warrantless arrest by federal agents. We agree with Alvarez and reverse the conviction.
 
 BACKGROUND
 
 2
 This case involves a conspiracy to smuggle cocaine into the United States. On January 29, 1983, narcotics officers from an interagency task force were engaged in surveillance of the vessel "Ciudad de Santa Marta," which had been docked in San Pedro Harbor since its arrival from Colombia the day before. The officers had reliable information that the vessel was carrying a large quantity of cocaine. There was also information that the smugglers were armed with automatic weapons.
 
 
 3
 At approximately 10 a.m., officers saw a late-model, red Oldsmobile drive to the dock. An individual entered the vehicle, and it left the area. The car returned later in the day. Two persons got out of the vehicle empty-handed and boarded the Ciudad de Santa Marta. They were seen leaving the vessel about five minutes later carrying a large cardboard box. They placed the box in the trunk of the automobile and drove away.
 
 
 4
 A short time later, agents stopped the vehicle and arrested the occupants. A search of the cardboard box revealed approximately 42 pounds of 88-percent pure cocaine. The suspects were taken to the U.S. Customs Service patrol office, where they were interviewed. By 1:30 p.m., one of the suspects had told agents that he was to deliver the cocaine to a person known as "Mauricio," who was staying in room 316 of the Holiday Inn in Long Beach. The suspect also told officers that a co-conspirator was in a sixth-floor room of the same motel.
 
 
 5
 Upon receiving this information, the officers in San Pedro contacted the Long Beach office of the Federal Bureau of Investigation to request assistance with arrests at the Holiday Inn. Agent Don Clark of the Long Beach FBI office then called several other agents to help with the arrests, and by 2 p.m. the agents had arrived at the FBI office. As it turns out, that office is only about 30 yards from the Holiday Inn. Nonetheless, the FBI did not begin any surveillance of the suspects' rooms at the Holiday Inn or of the area generally.
 
 
 6
 Although a U.S. magistrate is on duty at all times in the Central District of California, nothing in the record indicates that the agents even considered securing an arrest warrant either in person or by telephone, as permitted under Fed.R.Crim.P. 41(c)(2). Agent Clark, however, did call the U.S. Attorney's office. According to the testimony of the agents, the FBI was seeking the U.S. Attorney's approval of the anticipated arrest. When an Assistant U.S. Attorney gave his approval, the agents proceeded without warrants across the street to the hotel, arriving there at about 3 p.m.
 
 
 7
 After stopping at the registration desk to verify the identities of the suspects, agents went to room 618. There, they arrested Leonicio Rodriquez as he was attempting to escape by way of the balcony. A short time later, officers arrived at room 316, where they placed appellant Alvarez, the "Mauricio" previously referred to, under arrest. Officers found incriminating physical evidence, and Alvarez later confessed to his role in the conspiracy.
 
 
 8
 Before trial, Alvarez moved to suppress the physical evidence and his post-arrest statements as fruits of an unlawful arrest. At the hearing on the matter, the government offered no evidence concerning its failure to seek an arrest warrant, even by telephone. Nonetheless, the district court denied the motion, accepting the government's contention that exigent circumstances justified the warrantless seizure in this case. With the evidence admitted, Alvarez was convicted on both charges and sentenced to concurrent fifteen-year prison terms plus a special parole term of fifteen years.[1] He is currently in custody.
 
 DISCUSSION
 
 9
 The only issue in this appeal is whether the government sufficiently justified its failure to use a warrant when it arrested Alvarez. We conclude that it did not.
 
 
 10
 A warrantless arrest in a non-public place is presumptively unreasonable and violative of the fourth amendment. Payton v. New York, 445 U.S. 573, 586-89, 100 S.Ct. 1371, 1380-81, 63 L.Ed.2d 639 (1980). There are exceptions to the warrant requirement, the most common of which is the "exigent circumstances" exception, in which we recognize that some situations present a compelling need for instant arrest, and that delay to seek a warrant will endanger life, limb, or overriding law enforcement interests. In these cases, our strong preference for use of a warrant must "give way to an urgent need for immediate action." United States v. Blake, 632 F.2d 731, 733 (9th Cir.1980).
 
 
 11
 It must be emphasized, however, that the "exigent circumstances" exception is just that--an exception. Accordingly, we have held that "the government bears a heavy burden of demonstrating that exceptional circumstances justified a departure from the normal procedure of obtaining a warrant." United States v. Driver, 776 F.2d 807, 810 (9th Cir.1985). The government must produce "specific and articulable facts to justify the finding of exigent circumstances." Id. Although we review the district court's finding of facts and determinations of credibility for clear error, a conclusion of exigent circumstances is reviewed de novo. United States v. Good, 780 F.2d 773, 774 (9th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 1523, 89 L.Ed.2d 920 (1986); United States v. McConney, 728 F.2d 1195, 1204-05 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 12
 In this case, it is undisputed that between 90 minutes and two hours had elapsed from the time government agents learned where Alvarez was waiting until the time they actually arrested him at that location.[2] Although some of this time was required to assemble a team to effect the arrests and to brief the agents involved, the government agents found sufficient time to contact the U.S. Attorney's office and await "approval" for the arrest operation. During the one hour period when they were assembled at the FBI office, the agents made no attempt to secure the Holiday Inn or to monitor the suspect's movements, despite warnings from the suspects already under arrest that Alvarez would become suspicious if the cocaine were not delivered on time. The agent's actions in this case were thus fundamentally inconsistent with any true exigency.
 
 
 13
 But even if, as Judge Lucas found, "time was of the essence" for the agents that day, we could not conclude that the government had satisfied its burden in this case. In United States v. Manfredi, 722 F.2d 519, 522 (9th Cir.1983), we stated that the government's burden was not satisfied "unless the government demonstrates that a warrant could not have been obtained in time even by telephone under the procedure authorized by Fed.R.Crim.P. 41(c)(2)."[3]
 
 
 14
 In Manfredi, we upheld a warrantless entry of a hotel room. Despite our concern over the government's "[i]nexplicabl[e]" failure to introduce evidence concerning the impracticability of obtaining a warrant by telephone, id. at 523, the facts demonstrated conclusively that time would not have permitted securing a warrant, even by telephone. See id. at 522-23. We accordingly upheld the police action.
 
 
 15
 As in Manfredi, the government here offered no evidence concerning its failure to seek a telephone warrant.[4] Here, however, we cannot excuse the government's failure. The agents had a minimum of 90 minutes and sufficient time to discuss the case fully with personnel of the U.S. Attorney's office; we cannot say conclusively that the agents or the Assistant U.S. Attorney could not have complied with Rule 41(c)(2).[5] See United States v. McEachin, 670 F.2d 1139, 1147 (D.C.Cir.1981).
 
 
 16
 The government argues that obtaining a telephone warrant is not an easy task, and it points to our decision in United States v. Good, 780 F.2d at 775. But our decision here does not invariably require the government to have a telephone warrant before it moves in on a dangerous suspect. It simply requires the government either to attempt, in good faith, to secure a warrant[6] or to present evidence explaining why a telephone warrant was unavailable or impractical. Id.
 
 
 17
 The telephone warrant requirement is no mere formality. As the Supreme Court has recognized, warrants interpose a neutral and detached magistrate between law enforcement officials and targets of searches and seizures before a search or seizure has occurred. E.g., United States v. Leon, 468 U.S. 897, 913-14, 104 S.Ct. 3405, 3416-17, 82 L.Ed.2d 677 (1984). They are fundamental to the fourth amendment's protection of individual privacy. "An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964).[7] Congress, by enacting Rule 41(c)(2), has stated its strong preference for the use of warrants as well. Indeed, when warrants are used, a defendant's ability to challenge a search or seizure is severely limited; we accord great deference to a magistrate's advance determination that probable cause supports a search or arrest. E.g., Leon, 468 U.S. at 914, 104 S.Ct. at 3417; see also Fed.R.Crim.P. 41(c)(2)(G) (precluding, in most cases, motions to suppress based on alleged misuse of telephone warrant procedure).
 
 
 18
 In cases where exigent circumstances truly exist, we recognize that the usual fourth amendment protection must give way. But because of the danger that exceptions pose for fourth amendment guarantees, we are most unwilling to excuse the government's failure to seek a warrant in cases where no necessity for "immediate action" can be demonstrated. See United States v. Blake, 632 F.2d 731, 733 (9th Cir.1980).
 
 
 19
 We are even less willing to ratify the government's action where, as here, there has been not the slightest effort to comply with a clear, concise rule such as Rule 41(c)(2). Rule 41(c)(2) was designed to accommodate the needs of law enforcement while ensuring the preservation of constitutional rights. See Advisory Committee and Historical Notes to Fed.R.Crim.P. 41 (1977 Amendment); see also McEachin, 670 F.2d at 1146-48 (reviewing legislative history). The action of the agents and the Assistant United States Attorney in ignoring the telephone warrant procedure totally frustrates the accommodation approved by Congress. It cannot be sanctioned by us. The arrest of Alvarez was unlawful.
 
 
 20
 Although an illegal arrest does not void a subsequent conviction, United States v. Studley, 783 F.2d 934, 937 (9th Cir.1986), physical evidence and statements obtained as a result of such an arrest must be suppressed. E.g., Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S.Ct. 407, 415-16, 9 L.Ed.2d 441 (1963); see also United States v. Crews, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980). As a result, Alvarez's post-arrest statements as well as physical evidence seized from his hotel room should have been suppressed. The district court erred when it ruled otherwise.
 
 
 21
 Because this important evidence[8] should have been suppressed, we are forced to reverse the conviction and remand the cause for a new trial.[9] We recognize the serious consequences of reversal. They may be avoided in the future if law enforcement authorities will attempt in good faith to follow the procedures approved by Congress for the purpose of ensuring compliance with the fourth amendment.
 
 
 22
 REVERSED AND REMANDED.
 
 NOONAN, Circuit Judge, dissenting:
 
 23
 A distributor of millions of dollars worth of cocaine, captured red-handed as he waited for his share of a shipment of the drug from Colombia, is, by the decision of the court, given an improved chance of freedom. Overruling the experienced district judge who heard the testimony, this court suppresses evidence in the prosecution's case and, three years after the defendant has been convicted, gives him a new trial. If the Constitution of the United States require the result, the Constitution must be obeyed. Its guarantees extend to the meanest criminal. But does the Constitution requires the result, or does the court's decision rest on both a misreading of the evidence and a disregard of controlling precedent? My dissent is addressed to these questions.
 
 FACTS
 
 24
 On January 15, 1983 La Ciudad de Santa Marta, a freighter of the Flota Mercante Gran Colombiana, sailed from Buena Ventura, Colombia, and after stops in Nicaragua and Guatemala docked in Los Angeles on January 28, 1983. Concealed within her bowels were large quantities of cocaine. Intelligence operations on behalf of law enforcement agencies had alerted them to the shipment. The freighter was put under surveillance. The Customs Service, the Drug Enforcement Agency, the Federal Bureau of Investigation, the Los Angeles Police Department, and the Los Angeles County Sheriff's Department cooperated in observing, tracking, and arresting couriers who went to the ship and returned smuggling cocaine into this country. Persons were ultimately arrested; many were convicted. United States v. Alfonso, 759 F.2d 728 (9th Cir.1985). This case involves a member of the conspiracy who was tried separately.
 
 
 25
 Sometime in the afternoon of Saturday, January 29, 1983, the surveillance observed a red Oldsmobile approach the ship and a cardboard box be loaded into the Oldsmobile. The Oldsmobile was stopped a mile or two after leaving the dock. The box was found to contain "Colombian footballs," packages of the kind used to transport cocaine, as in fact they did. The driver, Finley Theodore Bramlett, and his two passengers, Santiago Perlaza Torres and Roberto Velaz, were arrested and taken to the Customs House for questioning.
 
 
 26
 The amount of cocaine in the car, to even an untrained eye, was great. It turned out to weigh 41.75 pounds. Subsequent testing showed its purity to be 88 percent, typical of the purity of cocaine being imported from Colombia. Its wholesale value was over $7 million. On the street it would have been sold cut to a percentage of purity between 5 percent and 20 percent. At 18 percent purity, the 41 pounds would have been expanded to 246 pounds, and the street value of the stuff would have been between $13 and $14 million (RT 211).
 
 
 27
 Aware that they had a major catch and that they had only captured couriers, the law enforcement officers asked their prisoners where they were taking the cocaine. Torres told them that he had been hired by "Mauricio" for $10,000 to deliver the goods to him at Room 316 of the Holiday Inn in Long Beach. He identified another participant in the plot as Leonico Rodriguez, presently in Room 614 of the same motel. His emphasis was on Mauricio: "Mauricio, Mauricio." The government, he said, had to hurry or he would be gone (RT 102). In Torres' account, Mauricio, the defendant here, was "Mr. Big," and he would become suspicious and leave if the courier did not show up promptly (RT 325).
 
 
 28
 Five FBI agents plus a Customs agent gathered at the FBI office near the Holiday Inn, crossed over to it, verified that Rooms 316 and 614 were registered to Alvarez and Rodriguez respectively, conferred about the best method of apprehending them, and struck. The room of Rodriguez, the small fry, was approached first. He ran out on a balcony and started hopping from balcony to balcony to elude capture. Agents went to the parking lot lest he try to jump down. "It was pretty hectic" (RT 300). But he was caught.
 
 
 29
 The agents then went to Room 316. Alvarez opened at an agent's knock and permitted entry. An agent seized him, wrestled him to the bed, and asked, "Where is the gun?" Alvarez nodded toward the pillow. A .38 caliber Smith & Wesson revolver was retrieved from under the pillow. It was loaded (RT 130). Alvarez was read his Miranda rights. In addition to the gun, a walkie-talkie set on a bureau top and a slip of paper with the notation "Beaufort Navigation," this company's number and a number assigned to La Ciudad de Santa Marta, were taken from the room.
 
 
 30
 Questioned by the agents, Alvarez said that he had been acting on the instructions of Jaime Garzon of Bogota, Colombia, who had told him to come to this place and await a phone call from a Mr. Alphonse. Alvarez made no admission as to any involvement with cocaine. At the trial Alvarez maintained that he was a Dolphins fan who had come to Los Angeles to see the Superbowl game that was to be played on Sunday, January 30th, between the Dolphins and Redskins. He denied any business relations with Torres and Bramlett. He said the gun had been recently given him by a friend in San Francisco for protection in a big city. He explained that he had the number of Beaufort Navigation (the agent for La Ciudad de Santa Marta) in order to inquire about a job for his travelling companion. He testified that the walkie-talkie had been bought by him on behalf of a police lieutenant in Colombia. He testified that $10,000 in cash which his wife Maria was bringing him on January 29 was to buy a Toyota for a relative in Colombia. He explained six phone calls from his motel room to Colombia as calls to a lawyer, Aurelio Diaz, about the import license for the car and as calls to his mother and mother-in-law in Cali.
 
 
 31
 The principal evidence against Alvarez was the testimony of Bramlett that he had had instructions to deliver the cocaine to Room 316; the testimony of two officers as to Torres' statements about Mauricio; the large quantity of cash found in Maria Alvarez' purse; and the inconsistency and implausibility of each one of Alvarez' explanations and tales. In need to borrow a gun from a friend in San Francisco, he has at his home in Texas three military weapons that he called "paratroopers," complete with tracer bullets (RT 30). A used car salesman in Fort Worth, he purported to have had the cash brought from Fort Worth to buy a car in Long Beach, getting the money from his wife's sister and his wife's brother-in-law in Cali (RT 270). A Dolphins fan, he did not know the name of the Dolphins' quarterback. The jury did not believe Alvarez and convicted him. The trial judge, Malcolm Lucas, observed that Alvarez had committed perjury in his defense (RT 532).
 
 
 32
 Issue. Alvarez' appeal is based on the claim that because his arrest was without a warrant, the gun, walkie-talkie, and slip of paper bearing the notation "Beaufort Navigation" should not have been admitted in evidence and the statements he made after his arrest should have been suppressed. The narrow issue is, Did the circumstances justify arrest without a warrant?
 
 
 33
 Analysis. United States v. Leon, 468 U.S. 897 (1984) has encouraged an empirical examination of the effects of the exclusionary rule and set the example itself in recognizing such research. Id. at 907, n. 6. A good place for a circuit court to start is the application of the rule by the circuit courts. Between 1980 and 1985 approximately 450 appeals were taken to federal circuit courts in which an issue was the suppression of the evidence of drug trafficking because of an alleged violation of the Fourth Amendment. The volume of appeals alone is suggestive of the uncertainties the rule generates. Intensive inspection of 250 of these 450[1] cases shows further that far from being a clear guide to police action and far from being a firm barrier to police excesses, the rule in its application depends on consideration of multiple small details. The rule is very fact-bound. The rule invites litigation focused on the facts. The litigation leads to review whose outcome is often affected by the forum and the particular panel hearing the appeal.
 
 
 34
 Federal constitutional protections should be uniform throughout the nation. Inspection of these cases shows startling variation by circuit:
 
 
 35
 Percent
Circuit Total Excluded Excluded
1st 20 0 0
2nd 20 1 5
3rd 3 0 0
4th 9 1 11
5th 26 6 23
6th 17 3 18
7th 18 0 0
8th 33 2 6
9th 44 10 23
10th 15 4 27
11th 43 6 14
D.C. 2 1 50
 ----- -------- --------
Total 250 34 13.6
 
 
 36
 In the Tenth, Fifth and Ninth Circuits evidence is excluded over 20 percent of the time; in the First, Second, and Seventh, it is excluded scarcely ever or not at all. Is it really credible that federal agents act more unlawfully in the Fifth, Ninth, and Tenth than in the First, Second, and Seventh? Is not the discrepancy explicable by different attitudes in the judges who review application of the rule?
 
 
 37
 Often enough the cases turn on very minor factual differences--differences important to different judges even within the same circuit but too subtle to be stated in a fashion capable of furnishing effective guidance to the police. Compare, for example, three cases decided within a year of each other in the same circuit where the issue in each was whether or not consent to a search was coerced. United States v. Gonzalez, 763 F.2d 1127 (10th Cir.1985); United States v. Recalde, 761 F.2d 1448 (10th Cir.1985); United States v. Obregon, 748 F.2d 1371 (10th Cir.1984). It would be an astute police officer who could determine from these cases when he was unlawfully coercing a suspect in an automobile to consent to a search of the car. The case-by-case approach that has become typical of appellate review recalls the prophecy made over thirty years ago of Justice Clark: such an approach "makes for such uncertainty and unpredictability that it would be impossible to foretell--other than by guesswork--just how brazen the invasion of the intimate privacies of one's home must be in order to shock itself into the protective arms of the constitution." Irvine v. California, 347 U.S. 128, 138, 74 S.Ct. 381, 386, 98 L.Ed. 561 (1954) (concurring opinion.)
 
 
 38
 This examination of cases decided by the circuit courts conveys the sense of a rule which is no bulwark for the rights of citizens but which sometimes is invoked by appellate courts with all the fussy formalism of an eighteenth century English tribunal rejecting a case because the plaintiff used the wrong form of action. A warm defender of the exclusionary rule asserts that it is not the rule itself but its application that should be criticized. Kamisar, "The Exclusionary Rule in Historical Perspective: The Struggle to Make the Fourth Amendment More than 'An Empty Blessing' ", 62 Judicature 337, 345 (1979).
 
 
 39
 The present case is one which should make defenders of the exclusionary rule wince. To enforce its own highminded view of how federal officers should respond to a dangerous felony, the court insists upon the use of a telephone to get a warrant. What the court requires would either have let the felon flee or have amounted to an empty ritual. In any case the court is unrealistic about the time the officers had to act.
 
 
 40
 We have this information about the times involved:
 
 
 41
 1. The approach of the red Oldsmobile to the ship: Two witnesses put this approach as occurring at 1:00 p.m. or later:
 
 
 42
 1:00-2:00--Edward L. Hoffman, Detective, Los Angeles Police Department (RT 72).
 
 
 43
 1:00--Michael Harmon, Special Agent, FBI (RT 77).
 
 
 44
 2. Entry on ship of the two suspects from the red Oldsmobile:
 
 
 45
 1:15--Michael D. Dromgoole, Special Agent, DEA (RT 81).
 
 
 46
 3. Arrest of the couriers Bramlett and Torres:
 
 
 47
 Approximately 12:00 noon--John Woodley Hale, Customs Officer (PTT 277).
 
 
 48
 Sometime after 1:30 p.m.--James Howard McCauley, Customs Officer (RT 89).
 
 
 49
 Approximately 1:30 p.m.--Pamela J. Baird, supervisor of Marine Enforcement Group, Customs (RT 95).
 
 
 50
 Hale's timing appears to be aberrant and is contradicted by his own later declaration that the arrest was made at 2:00. If Hale's inconsistent testimony is put aside, the chronology to this point is basically consistent.
 
 4. Interrogation of the suspects:
 
 51
 1 hour--Hale (RT 286).
 
 
 52
 10 to 30 minutes--Baird (RT 100).
 
 
 53
 1:30-1:45--Richard Madden, Deputy Sheriff, Los Angeles County (PTT 324).
 
 
 54
 According to the arresting officer McCauley, he got the Oldsmobile out of traffic and examined the box (RT 90). Five to ten minutes should be allowed for these operations and another five for bringing the suspects to the Customs House for interrogation. It is probable, therefore, that the suspects were not interrogated before 1:45.
 
 5. Gathering of Agents at the FBI office:
 
 55
 Approximately 2:00--Don K. Clark, FBI Agent in Charge of Long Beach (RT 127).
 
 
 56
 Approximately 2:00 p.m.--Paul H. Breen, Special Agent FBI (RT 134).
 
 
 57
 Approximately 1:00-1:30--Lawrence Gallagher, Special Agent FBI (RT 108) (trial testimony).
 
 
 58
 Approximately 1:45-2:00--Lawrence Gallagher (PTT 312) (suppression hearing testimony).
 
 
 59
 Gallagher's testimony at the trial is inconsistent with his own testimony at the suppression hearing and with that of Clark and Breen. It is in serious conflict with that of most of the witnesses to the surveillance of the Oldsmobile, the arrest of the suspects, and their interrogation. There is thus good reason to believe that it is inaccurate. Note also that besides five FBI agents, Customs Officer Hale was dispatched to join in the arrest (RT 120). Hale had to put on his bullet-proof vest and to come from the Customs House, a distance of five miles, a trip of about 20 minutes (PTT 287-288). It is reasonable to conclude that the arresting officers were assembled at the FBI office a little after 2:00 p.m. This timing assumes they were brought together almost instantaneously after the information about Alvarez had been gained by the interrogation of the suspects.
 
 
 60
 6. Gathering of the agents at the Holiday Inn:
 
 
 61
 20-30 minutes after gathering at FBI office--Gallagher (RT 115).
 
 
 62
 3:00--Hale (PTT 293).
 
 
 63
 Hale's testimony again seems aberrant.
 
 
 64
 7. Time spent at the Holiday Inn before the arrests:
 
 
 65
 15-30 minutes--Gallagher (RT 116).
 
 
 66
 10-15 minutes--Hale (PTT 296).
 
 
 67
 This time, according to Gallagher, was spent discussing the mechanics of making the arrests. It seems a not unreasonable time to devote to considering the capture of two men believed to be armed and to be involved in commission of a serious felony. According to the chronology inferred to this point, the agents would have been ready to make the arrests at about 2:30 p.m.
 
 8. Time of arrest of Alvarez:
 
 68
 2:30--Alvarez himself (RT 282).
 
 
 69
 9. Time of Interrogation of Alvarez at Customs House:
 
 
 70
 Between 2:30 and 3:00--Richard Madden, Deputy Sheriff (RT 169) (sees Alvarez at Customs House).
 
 
 71
 3:30 Madden (RT 179) (begins interrogation).
 
 
 72
 3:30 (interrogation begun)--Kristen Anderson, Special Agent FBI (RT 184).
 
 
 73
 If, as seems clear from the foregoing, Alvarez was arrested about 2:30 p.m., it is consistent with that chronology that for 5 to 10 minutes he should have been held at the motel and that taking the 20 minute ride to the Customs House he should have been there by 3:00 and interrogated by 3:30. With the exception of Hale's "noon" and of Gallagher's inconsistent testimony, the testimony as to time is reasonably clear. It is also credible. There is no suggestion that officers from a variety of law enforcement agencies conspired to concoct the chronology. Each officer has said what he remembers. The defendant himself puts the time of his arrest precisely at 2:30.
 
 
 74
 It might be objected that all of the information as to chronology was not developed at the suppression hearing but came to light in the trial itself. Surely we are not conducting a kind of game in which we must close our eyes to facts that bear on the issue at hand and have been developed in the course of the litigation. The defendant on appeal picks and chooses times favorable to his contention, using both the suppression hearing and the trial. Appellant's Opening Brief, pp. 4 and 5. We are entitled to look at the best data available. The defendant cannot complain when his own testimony fixes the time of his arrest. The court prefers to stick to findings at the suppression hearing made obsolete by the new and better information developed at the trial.
 
 
 75
 In the light of all the testimony the government had about 30 minutes between getting the information from Torres at close to two o'clock and the actual arrest of Alvarez at half past two. The opinion of the court is mistaken when it asserts that it "is undisputed that between 90 minutes and two hours had elapsed." The record itself is to the contrary.
 
 
 76
 The court, it may be said, had a right to rely on the government's brief which chose in turn to rely in part on the chronology offered by Customs Officer Hale. Appellee's Brief, p. 7. The government's statement, if closely read, does not concede that 90 to 120 minutes had elapsed, but it does appear to concede that a little over an hour elapsed after receiving Torres' tip. But in a matter of this kind the court should not be confined by a semi-concession of counsel. The record is before us. "Ordinarily, when a motion to suppress has been denied, we view the evidence in the light most favorable to the Government ... Moreover, where no findings of fact have been made, and in the absence of a request for such findings, we will uphold the result if there is a reasonable view of the evidence that will sustain it." United States v. Williams, 630 F.2d 1322, 1327 (9th Cir.1980); United States v. Miner, 484 F.2d 1075, 1077 (9th Cir.1973). This court ignores these precedents.
 
 
 77
 The testimony as a whole does not show the government's agents inexplicably dawdling for 90 or 120 minutes. Instead it suggests a fast-moving scenario in which the only pause was the pause at the Holiday Inn just before the dangerous business of attempting the arrests were made. That men about to confront armed criminals should take a few minutes to concentrate on the best way of accomplishing the riskful task ahead scarcely shows that they had the leisure to assemble the necessary data to support a formal request for a warrant. They were in pursuit of their legitimate prey. The trail was hot, the need for action imperative.
 
 
 78
 It is argued that they had time to call the United States Attorney to get his approval. We know almost nothing about this alleged call. It is testified to only by Customs Officer Hale who says he was told the FBI had called that office (PTT 290-291; RT 124). We know nothing of the duration of the call. A quick check with a lawyer is different from submission of sworn facts to a magistrate who will make an independent evaluation of their sufficiency. Unless it is assumed that a magistrate would have instantly issued a warrant after a pro forma recital, the time to get even a telephonic warrant would have taken precious moments from the pursuit. "A telephonic warrant may not be obtained simply by calling a magistrate. Among other things a 'duplicate original warrant' must be prepared in writing and read to the magistrate verbatim." United States v. Manfredi, 722 F.2d 519, 523 (9th Cir.1983). After the warrant has been prepared and read, one assumes that the magistrate will take time to question and to evaluate. A magistrate cannot perform his duty by merely serving "as a rubber stamp for the police," Aguilar v. Texas, 378 U.S. 108 at 111, 84 S.Ct. 1509 at 1512, 12 L.Ed.2d 723 (1964) or as "an adjunct law enforcement officer," Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-27, 99 S.Ct. 2319, 2325, 60 L.Ed.2d 920 (1979). Convenient as the telephone is, it is difficult to believe that a magistrate making an independent assessment could have responded to the rush of events. If the assumption is indulged that the magistrate would have reacted automatically with an authorization, it is very difficult to understand what such a ritual would have achieved. The telephone warrant requirement, the opinion of the court declares, is "no mere formality." If that is true, how could the warrant have been obtained in the minutes that elapsed between getting Torres' tip and the arrest of Alvarez?
 
 
 79
 A series of precedents are disregarded by the court in finding that exigent circumstances did not exist. Consider the teaching of these cases decided by this circuit: United States v. Flickinger, 573 F.2d 1349, 1355 (9th Cir.1978) (Exigent circumstances exist "where police know or reasonably believe that a suspect is armed, for quick action increases the likelihood that the suspect may be disarmed without injuring others"); United States v. McLaughlin, 525 F.2d 517, 521 (9th Cir.1975) (An earlier arrest "made it likely that those in the McLaughlin residence would discover that they were under surveillance. This would lead them to destroy or remove the evidence, if possible. Simultaneously, they would canvass the possibilities of escape. The officers, on the other hand, could take their chances with respect to the destruction of the evidence, obtain reinforcements, and settle in for several hours of siege while awaiting the arrival of the warrant, or move quickly to arrest ... We cannot accept the view that the Fourth Amendment requires that the officers pursue the former course."); United States v. Bustamante-Gamez, 488 F.2d 4, 8-9 (9th Cir.1973) ("... it may have been theoretically possible for the officers to withdraw and obtain a warrant. However, the method of investigation had made it more than probable that the occupants of the garage knew or might at any time learn of their presence ... These same considerations militated against cordoning off the residence while awaiting a warrant. While such action may be appropriate in many cases here it would have been equivalent to laying public siege to the premises. This would enable, perhaps provoke, the suspects to take steps to destroy the evidence, set up resistance to an eventual entry, or plan a desparate flight ...") Cf. United States v. Hultgren, 713 F.2d 79 (5th Cir.1983) (Over three hours elapsed between the time agents had probable cause justifying issuance of an arrest warrant and the time of the arrest; the court refused to suppress the cocaine found at the time of the arrest. The court observed at 87 that unlike a routine felony arrest, "the fluidity of an ongoing investigation of the distribution of narcotics makes the obtaining of an adequate search warrant more difficult to time in the flow of events.")
 
 
 80
 The cases explicitly considering the possibility of a telephone warrant do not speak differently, e.g. United States v. Berrick, 710 F.2d 1035, 1039 (5th Cir.1985); United States v. Cuaron, 700 F.2d 582, 590 (10th Cir.1983); United States v. Todisco, 667 F.2d 255 (2d Cir.1981). As Chief Judge Browning expressed it:
 
 
 81
 Once armed suspects in a drug transaction have been alerted to possible detection, the risk that delay in effecting an arrest will result in the destruction of the contraband and increase the danger of injury to the agents or others cannot be dismissed as merely speculative. Manfredi at 523.
 
 
 82
 Alvarez was aware with every passing minute that his couriers were late. He had a loaded weapon. The government was not compelled to lay siege to the Holiday Inn (to "secure it," as the opinion of the court suggests) or to send an inadequate number of men. When a sufficient force was assembled and a plan laid out, the government did not delay. The circumstances required that it act as expeditiously as it did.
 
 
 83
 In weighing all the elements to determine whether the circumstances were exigent, an analogy is afforded by Leon 's treatment of the good faith exception to the exclusionary rule. An "assessment of the flagrancy of the police misconduct constitutes an important step in the calculus." United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Analogously, we should look at the flagrancy of the police conduct here. Six law enforcement agencies had participated in painstaking surveillance of the smuggling. The agencies were cooperating, not competing. There was no incentive to beat out some other agency. The only motivation here was to crown careful surveillance with actual capture. The belief was held that the United States Attorney had approved immediate action. The conduct engaged in was sufficiently reasonable to seem lawful to a very able federal district judge. Few persons would care to characterize the arrest of Alvarez as a "flagrant" violation of the Fourth Amendment.
 
 
 84
 A good additional test is this: On the facts established in this case should Alvarez be granted summary judgment if he sued the arresting agents for violation of his civil rights? If they violated the Fourth Amendment, he is entitled to damages from them. See Segura v. United States, 468 U.S. 796 at 812, 104 S.Ct. 3380 at 3390, 82 L.Ed.2d 599 (1984). If the court is correct, not only are these brave men to be frustrated in their efforts to apprehend this cocaine trader, they are potentially liable to be mulcted to his benefit for having had the audacity to enter the motel room harboring him. Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In an action by Alvarez against Hale and the others, it is almost impossible to believe that exigent circumstances would not be found to be a good defense.
 
 
 85
 Finally, weight must be given to the gravity of the crime Alvarez was engaged in committing. Welsh v. Wisconsin, 466 U.S. 740, 751-53, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984) (per Brennan, J.); United States v. Baldacchino, 762 F.2d 170 (1st Cir.1985); Dorman v. United States, 435 F.2d 385 (D.C.Cir.1970). A judgment of proportion is required. Exigency decreases as the gravity of the crime decreases and, contrariwise, increases as the crime is greater. The crime which Alvarez was in the act of committing--the carrying out of a conspiracy to distribute cocaine--was one of the most serious of federal felonies.
 
 
 86
 By 1983 cocaine was already a serious danger to health and lives in America. The number of high school seniors who had used the drug was estimated at 11.4 percent, double the number of such users in 1975. Kozel and Adams, ed., Cocaine Use in America; Epidemiologic and Clinicial Perspectives (NIDA Research Monograph 61, 1985) 59. Young adult users were estimated to have more than tripled in the past decade. Id. 76. The National Drug Enforcement Agency's estimate of cocaine consumption in the United States in 1983 was 50 to 68 metric tons. The National Narcotics Intelligence Consumers Committee, Narcotics Intelligence Estimate 1984 (DEA 1984) 26. Extraordinary as this estimate is, it is not out of relation to the number of pounds of cocaine seized in 1983 by the United States Customs--19,601 pounds. Sourcebook of Criminal Justice Statistics 1984, 536. That the total consumption should be at least five times the amount prevented from being consumed seems not an unlikely proportion.
 
 
 87
 Use of this drug had these consequences in the United States: (1) an estimated 617 cocaine-related deaths in 1983 (one third of them murders). Narcotics Intelligence Estimate 1984 p. 23. (2) Over 10,600 cocaine-related hospital emergencies by 1984. DEA, Special Report: Worldwide Cocaine Trafficking Trends (May 1985) p. 21. (3) By 1986 an estimated 3,000,000 addicts. United States News and World Report, July 21, 1986. Cocaine has "powerful reinforcing properties" that make for easy addiction, Kozel and Adams, 179, and make it very hard to break the acquired habit, id. 176.
 
 
 88
 Victims of addiction studied at one clinical dependence program in Chicago were at every level of society and education. One quarter were college graduates; 4 percent had degrees at the doctoral level. Id. 173. But a group that has been especially exploited by the drug is a minority defined by race. In the Chicago study almost half the users were black males. Id. 172. The increase to 10,600 hospital emergencies due to cocaine was primarily due to the impact of freebasing among black males. DEA, Special Report: Worldwide Cocaine Trafficking Trends (May 1985) 21.
 
 
 89
 Not only is a special minority a target for the drug; not only are young adults and college graduates addicted; not only are high school seniors exposed to the risk of addiction, but the drug takes its toll among babies who are involuntarily affected. For example, Dr. Leonard Glass, a pediatrician at Kings County Hospital, New York, reports that between one third and one half of the infants of crack users show "signs of neurological disorders." Kerr, "Babies of Crack Users Fill Hospital Nurseries," New York Times, August 25, 1986, Sec. B., p. 1. The director of pediatrics at Harlem Hospital, Dr. Margaret C. Heagarty, reports "an astonishing increase of babies with cocaine in their urine." At the same time the users of cocaine in the form of crack have contributed to a substantial rise in the number of abused and neglected children. Id., quoting Eric Brettscheider, deputy administrator of New York City's Human Resources Administration.
 
 
 90
 The impact of the drug on the laws of the United States may begin to be measured by the estimated number of offenses relating to "opium or cocaine and their derivatives" in 1982--112,900. Sourcebook of Criminal Justice Statistics 1984, p. 450. These statistics are only the beginning because cocaine is an expensive habit. In the Chicago study the users who had come for treatment to the chemical dependency program between 1979 and 1983 were spending an average of $800 a week to obtain the drug. Kozel and Adams, 175. For many of the poor among the users crime could have been the only way of getting the money to pay for their addiction.
 
 
 91
 Drug trafficking is "the most widespread and lucrative organized crime operation in the United States, accounting for nearly 40 percent of this country's organized crime activity." President's Commission on Organized Crime, Report to the President and the Attorney General (March 1986) 71. Control of the cocaine industry is maintained "by a cartel of Colombian traffickers" who are "the largest, wealthiest, most sophisticated" in the business. Id. at 73. In 1983, seventy-five percent of the cocaine coming into the United States was believed to come from Colombia. Narcotics Intelligence Estimate 31. Gangsters in that country had developed powerful multinational organizations which were criminal at home as well as abroad but reckless and ruthless enough to arrange the assassination in 1984 of Rodrigo Lara Bonillo, Colombia's courageous Minister of Justice. Time, February 25, 1985, p. 2.
 
 
 92
 Alvarez was a Colombian national who had traveled to Colombia as recently as November and December 1982. We have no reasons to believe that he was "Mr. Big" in the sense of being near the top of an organization. He was part of a Colombian network. Able to dispense $10,000 in cash to the more humble couriers, he was an important cog in the business of making money out of addicting Americans. It is a travesty of the noble purposes of the Fourth Amendment to stretch it to shield this trafficker in human misery.
 
 
 93
 APPENDIX
 CASES INVOLVING MOTIONS TO SUPPRESS DRUG EVIDENCE
 January 1, 1983-September 1, 1986
Defendant Citation-- Drugs Suppression
--------- Circuit ----- ------------
 Court
 ---------
Henry Baswell 792 F.2d 755 2.9 oz. cocaine No
 (8th 1986)
Anthony Peters, et al. 791 F.2d 1270 cocaine No
 (7th 1986)
Fabio Alonso 790 F.2d 1489 20,000 lbs. No
 (10th 1986) marijuana
Anthony Puglisi, 790 F.2d 240 cocaine No
et al. (2nd 1986)
Karl Most 789 F.2d 1411 166.5 grams No
 (9th 1986) heroin
Raymond Jimeniz 789 F.2d 167 cocaine No
 (2nd 1986)
Douglas Rambo 789 F.2d 1289 10 oz. cocaine No
 (8th 1986)
Jesus Munoz-Guerra 788 F.2d 295 large quantity Yes
 (5th 1986) marijuana
 and some cocaine
William G. LaChance, 788 F.2d 856 marijuana import No
et al. (2nd 1986) conspiracy
Glenn Hawkins & Melvin 788 F.2d 200 cocaine No
Williams (4th 1986)
Stephen Barone 787 F.2d 811 1 oz. cocaine No
 (2nd 1986)
Frederick Silvestri 787 F.2d 736 99 bales No
 (1st 1986) marijuana and
 1,489 lbs.
 hashish
Gregory Shegog 787 F.2d 420 large quantity of No
 (8th 1986) phencyclidine
Aldo Mazzone, et al. 782 F.2d 957 drugs No
 (7th 1986)
Merle Owens 782 F.2d 146 2 oz. cocaine Yes
 (10th 1986)
William Whaley, et al. 781 F.2d 417 marijuana plants Yes
 (5th 1986)
Walker Whaley 779 F.2d 585 cocaine No
 (11th 1985) laboratory
George Veillette 778 F.2d 899 bales of No
 (1st 1985) marijuana
Richard Schuster 777 F.2d 264 controlled No
 (5th 1985) medical
 substance
John Ladson & Eunice 774 F.2d 436 cocaine Yes
Oliver (11th 1985)
Ralph Elkins, et al. 774 F.2d 530 marijuana No
 (1st 1985)
Augustine Lopez 777 F.2d 543 11 boxes cocaine No
 (10th 1985)
Telmo Coronel, et al. 750 F.2d 1482 cocaine No
 (11th 1985)
Johnathan Baldwin, 785 F.2d 1506 deliveries Notebook--
et al. (11th 1986) 1 lb. harmless
 error issue
 not reached.
Donald McGauley 786 F.2d 888 525.96 grams No
 (8th 1986)
Toyin Okeyan, 786 F.2d 832 several packages No
Eriten Kelemi (8th 1986) of heroin
 concealed in
 rectum
Rita Gatewood 786 F.2d 821 33 k grams heroin No
 (8th 1986)
Ralph Johnston, et al. 784 F.2d 416 several tons No
 (1st 1986) marijuana
Alfredo Wright-Barker, 784 F.2d 161 23 1/2 tons No
et al. (3rd 1986) marijuana
Richard Oswald 783 F.2d 663 4.4 lbs. cocaine No
 (6th 1986)
Gregory Smith, 783 F.2d 648 $75,000 marijuana No
Eric Helton (6th 1986)
Bernice Mitchell 783 F.2d 971 small amounts of No
 (10th 1986) PCP
Ronald Wulferdinger 782 F.2d 1473 several drugs No
 (9th 1986)
Henry Espinosa 782 F.2d 888 3 bags of cocaine No
 (10th 1986)
Jack Cilley, et al. 785 F.2d 651 1000 lbs. No
 (9th 1985) marijuana
David Kirk 781 F.2d 1498 kgs of cocaine No
 (11th 1986)
Richard Reen, et al. 780 F.2d 1541 large quantities No
 (11th 1986) of marijuana
 on ship
Edward Fixen 780 F.2d 1434 1 kg. cocaine No
 (9th 1986)
Alvin Tolliver, et al. 780 F.2d 1177 123.6 grams No
 (5th 1986) heroin
Anthony Grandison, 780 F.2d 425 drug-related No
et al. (4th 1985) murder
Veleeta Jackson 778 F.2d 933 26 grams No
 (2nd 1985)
Sam Driver and 776 F.2d 807 heroin Excluded
Ramona Driver (9th 1985) pending
 remand
Thomas Ricks, et al. 776 F.2d 455 drug conspiracy Not excluded
 (4th 1985) --reversed
 on other
 grounds
Roland Asselin 775 F.2d 445 12 oz. cocaine No
 (1st 1985)
Tom Whittington 775 F.2d 825 cocaine No
 (7th 1985)
Louis Ippolito, et al. 774 F.2d 1482 drug conspiracy wiretap
 (9th 1985) excluded
Alice Gilbert 774 F.2d 962 heroin No
 (9th 1985)
Thomas Gay 774 F.2d 368 1.2 lbs. cocaine No
 (10th 1985)
Loren Denney 771 F.2d 318 21 lbs. marijuana No
 (7th 1985)
John M. Rooney, et al. 771 F.2d 589 large amounts of No
 (1st 1985) baled marijuana
James Lambert, 771 F.2d 83 cocaine No
Phillip Block (6th 1985)
Oscar Bent-Santana 774 F.2d 1545 bales of No
 (11th 1985) marijuana
Jorge Cardona 769 F.2d 625 large amounts of No
 (9th 1985) cocaine
Michael Miller 769 F.2d 554 18 kgs. of Yes
 (9th 1985) cocaine
James McHugh 769 F.2d 860 32 bales of No
 (1st 1985) marijuana
Danny Krauth 769 F.2d 473 362 grams of No
 (8th 1985) cocaine
Juan Arenal, et al. 768 F.2d 263 47 grams cocaine No
 (8th 1985)
Angel Lopez-Pages 767 F.2d 776 278 grams cocaine No
 (11th 1985)
Mikal Amuny, et al. 767 F.2d 1113 packages of Yes
 (5th 1985) marijuana
Patrick C. Remigio 767 F.2d 730 methamphetamine No
 (10th 1985) factory
Ronald Dunn 766 F.2d 880 phenylacetone Yes
 (5th 1985) factory
Terry Rabenberg 766 F.2d 355 2 packages of No
and Randy Lange (8th 1985) narcotics
Glen Borys 766 F.2d 304 973 grams cocaine No
 (7th 1985)
Candis White 766 F.2d 22 3 kg. cocaine No
 (1st 1985)
Dennis Collis 766 F.2d 219 654 grams cocaine No
 (6th 1985)
Bradford Burt 765 F.2d 1364 drug conspiracy No
 (9th 1985)
Jose Marin 765 F.2d 890 drug conspiracy Yes
 (9th 1985)
Jerry Ford 765 F.2d 1088 cocaine No
 (11th 1985)
Donald Kapperman 764 F.2d 786 cocaine No
 (11th 1985)
Scott Duncan 763 F.2d 220 4.5 kg. marijuana No
 (6th 1985) 53 g. cocaine
Jose Gonzalez 763 F.2d 1127 cocaine Yes
 (10th 1985)
Scott Butler 763 F.2d 11 cocaine, LSD and No
 (1st 1985) marijuana
Shaun Baldacchino 762 F.2d 170 bales of No
 (1st 1985) marijuana
Ronald Watchmaker, 761 F.2d 1459 drug No
et al. (11th 1985) paraphernalia
Antonio Lopez, et al. 761 F.2d 632 bales of No
 (11th 1985) marijuana
Harlan and Harold 761 F.2d 1313 amphetamine No
Peacock (9th 1985) factory
Hector Marin, 761 F.2d 426 1 kg. cocaine No
Aida Barreta (7th 1985)
Miguel Recalde 761 F.2d 1448 10 kg. cocaine Yes
 (10th 1985)
John Nabors 761 F.2d 465 unspecified No
 (8th 1985)
Charles Jackson and 760 F.2d 570 3500 Preludin No
Anthony Browning (5th 1985) pills
Raymond Alexander, 761 F.2d 1294 cocaine factory No
et al. (9th 1985)
Ramon Milian-Rodriquez 759 F.2d 1558 62 lbs. cocaine No
 (11th 1985)
Richard Gant, et al. 759 F.2d 484 5 lbs. cocaine No
 (5th 1985)
John Humphrey, et al. 759 F.2d 743 3100 lbs. No
 (9th 1985) marijuana
Serafin Alfonso, 759 F.2d 728 several lbs. of No
et al. (9th 1985) cocaine
William Willis, et al. 759 F.2d 1486 800 lbs. cocaine No
 (11th 1985)
Gilbert Moreno 758 F.2d 425 cocaine No
 (9th 1985)
Oscar Barrientos 758 F.2d 1152 cocaine No
 (7th 1985)
Barbara Fama 758 F.2d 834 131 lbs. heroin; No
 (2nd 1985) 2 1/2 lbs.
 cocaine; 100 lbs.
 marijuana
Rick R. Wilson 758 F.2d 304 cocaine No
 (8th 1985)
Dennis Swingler, 758 F.2d 477 60 lbs. No
et al. (10th 1985) amphetamine
Kenneth Thomas, et al. 757 F.2d 1359 drug conspiracy No
 (2nd 1985)
William Percival, 756 F.2d 600 substantial No
et al. (7th 1985) amounts of
 marijuana
Celestino Figueroa, 757 F.2d 466 unspecified No
et al. (2nd 1985) narcotics
Donald Settegast, 755 F.2d 1117 phenylacetone No
Thomas Green (5th 1985)
Gregory Williams 754 F.2d 672 996 grams cocaine No
 (6th 1985)
Sylvester Domme, 753 F.2d 950 cocaine and No
et al. (11th 1985) marijuana
David Marcus 753 F.2d 1475 methamphetamine No
 (9th 1985) laboratory
Victor 753 F.2d 785 100 lbs. No
Corral-Villavicencio (9th 1985) marijuana
Clifford Antone, 753 F.2d 1301 856 lbs. No
et al. (5th 1985) marijuana
Dean Felton, et al. 753 F.2d 256 marijuana No
 (3rd 1985)
Alberto Ritter 752 F.2d 435 7 kg. cocaine No
 (9th 1985)
Michael Badessa, Jr. 752 F.2d 771 cocaine and No
 (1st 1985) marijuana
Victoria Hicks 752 F.2d 379 1 kg. cocaine No
 (9th 1985)
William Pringle III, 751 F.2d 419 package of No
et al. (1st 1985) marijuana
Michael Rabb 752 F.2d 1320 narcotics No
 (9th 1984) paraphernalia
Jimmy Webster, et al. 750 F.2d 307 large quantity of No
 (5th 1984) marijuana
Leocadio Figuera 750 F.2d 232 30 grams cocaine No
 (2nd 1984)
Addison Berisford, 750 F.2d 57 sizeable No
et al. (10th 1984) quantities of
 controlled drugs
Fernando Obregon 748 F.2d 1371 3 bags of cocaine No
 (10th 1984)
Thomas McMurray 747 F.2d 1417 1 bag of cocaine No
 (11th 1984)
James Roberts 747 F.2d 537 marijuana farm No
 (9th 1984)
Lewis Perry 746 F.2d 713 package of No
 (11th 1984) cocaine
Robert Knobeloch 746 F.2d 1366 cocaine No
 (8th 1984)
Richard McLernon, 746 F.2d 1098 cocaine-drug Some
et al. (6th 1984) conspiracy Suppressed
Cesar Moya 761 F.2d 322 501 grams cocaine No
 (7th 1984)
Andrew Eschweiler 745 F.2d 435 cocaine No
 (7th 1984)
Steven Young, et al. 745 F.2d 733 heroin No
 (2nd 1984)
Thomas Manbeck, et al. 744 F.2d 360 bales of No
 (4th 1984) marijuana
Jeffrey Lee, et al. 743 F.2d 1240 27 bags of No
 (8th 1984) marijuana
Vidal Moreno 742 F.2d 532 1 kg. cocaine Yes
 (9th 1984)
Mario Adamo, et al. 742 F.2d 927 drug conspiracy No
 (6th 1984)
Pornpong Vanichromanee 742 F.2d 340 heroin No
 (7th 1984)
Jose Garcia, 741 F.2d 363 several kilos No
Michael Trupei (11th 1984) cocaine
Lizia Gaviria 740 F.2d 174 1 1/2 lbs. No
 (2nd 1984) cocaine
Luis Torres, et al. 740 F.2d 122 1/2 kg. cocaine No
 (2nd 1984)
Fernando 739 F.2d 1000 bags of marijuana No
Cisneros-Mireles (5th 1984)
Figuerio Pantoja-Soto, 739 F.2d 1520 methaqualone No
et al. (11th 1984) tablets
Oscar Torres, et al. 741 F.2d 1323 8 bales marijuana No
 (11th 1984)
Frederick Marsh, 747 F.2d 7 60 tons marijuana No
et al. (1st 1984)
Mohan Markani, et al. 738 F.2d 538 1000 lbs. No
 (2nd 1984) hashish
Carlos Morales 737 F.2d 761 21 oz. cocaine Yes
 (8th 1984)
Orbry Williams 737 F.2d 735 methamphetamine No
 (8th 1984)
John Beale 736 F.2d 1289 cocaine No
 (9th 1984)
Robert Snowden, et al. 735 F.2d 1310 5400 lbs. No
 (11th 1984) marijuana
Frank Maybusher 735 F.2d 366 large quantity of No
 (9th 1984) marijuana
Billy Little 735 F.2d 1049 1100 lbs. No
 (8th 1984) marijuana
John Sager and 735 F.2d 1049 1100 lbs. Yes
Jay Harmon (8th 1984) marijuana
Bernardo Betancourt, 734 F.2d 750 methaqualone No
et al. (11th 1984)
Gloria 734 F.2d 1425 cocaine No
Saldarriaga-Marin, (11th 1984)
et al.
John Russell, et al. 734 F.2d 1048 large bags of No
 (5th 1984) cocaine
Cielo Marin-Buitrago, 734 F.2d 889 1 lb. cocaine No
Tomas Morales (2nd 1984)
John Hillison, et al. 733 F.2d 692 258 grams No
 (9th 1984) marijuana
 450 grams cocaine
Ernest Estrada, Jr., 733 F.2d 683 phencyclidine No
et al. (9th 1984)
Debby and Gary Givens 733 F.2d 339 2 oz. cocaine No
 (4th 1984)
John Thornton 733 F.2d 121 packets of No
 (D.C. 1984) cocaine
Michael Sadosky 732 F.2d 1388 345 grams cocaine No
 (8th 1984)
Alvin Campbell 732 F.2d 1017 cocaine No
 (1st 1984)
James Elkins, 732 F.2d 1280 cocaine, hashish, No
Carol Dichtel (6th 1984) quaaludes
Alan Singer and 732 F.2d 631 1 lb. cocaine No
John Renick (8th 1984)
Steven Rodgers 732 F.2d 625 69 grams cocaine No
 (8th 1984)
George Reed, et al. 733 F.2d 492 15,000 lbs. No
 (8th 1984) cocaine
Catalino Collazo 732 F.2d 1200 marijuana remand for
 (4th 1984) further
 findings
Bisram Sugrim 732 F.2d 25 cocaine No
 (2nd 1984)
Dan McKaskle 731 F.2d 1196 methamphetamine No
 (5th 1984)
Bruce Brown, 731 F.2d 1491 packets cocaine Yes
James Mairkowski (11th 1984)
William Newbern, 731 F.2d 744 large amounts of No
Robert Sheppard (11th 1984) marijuana
Doug Ard, et al. 731 F.2d 718 19,000 lbs. No
 (11th 1984) marijuana
David-Mendia 731 F.2d 1412 20 oz. heroin No
 (9th 1984)
Rosa Hernandez 731 F.2d 1369 88 balloons Yes
 (9th 1984) of cocaine
Claude West 731 F.2d 90 unspecified No
 (1st 1984)
Chaim Levy 731 F.2d 997 heroin No
 (2nd 1984)
Herbert Reeves, 730 F.2d 1189 5 lbs. marijuana No
Eddie Branscum (8th 1984)
Ted Hill, 730 F.2d 1163 marijuana Some evidence
Darrell Frazier (8th 1984) suppressed
Phillip Smith, et al. 730 F.2d 1052 cocaine No
 (6th 1984)
Harry Packer, III 730 F.2d 1151 mescaline factory No
 (8th 1984)
Inez Guerrero, et al. 756 F.2d 1324 heroin No
 (9th 1984)
Harold Butts 729 F.2d 1514 marijuana No
 (5th 1984)
Marie Vega-Barvo 729 F.2d 1341 135 No
 (11th 1984) cocaine-filled
 condoms
Miguel A. Padilla 729 F.2d 1367 432 grams cocaine No
 (11th 1984)
Jose Castaneda, et al. 729 F.2d 1360 832 grams cocaine No
 (11th 1984)
Michael Carter 729 F.2d 935 404 marijuana No
 (8th 1984) plants; 100 lbs.
 marijuana
Charles Griffin 729 F.2d 475 805 grams No
 (7th 1984) phencyclidine
Harriet Impink, 728 F.2d 1228 50 lbs. Yes
Richard Bolanas (9th 1984) methamphetamine
Cornelius Franklin 728 F.2d 994 35 grams cocaine No
 (8th 1984)
Edward Nigro 727 F.2d 100 5420 lbs. No
 (6th 1984) marijuana
Leonard Stelle, et al. 727 F.2d 580 1200 lbs. cocaine No
 (6th 1984)
Michael Pollock 726 F.2d 1456 methamphetamine No
 (9th 1984) factory
Carolyn Landis, et al. 726 F.2d 540 methamphetamine No
 (9th 1984)
Peter Francesco 725 F.2d 817 1 kg. cocaine No
 (1st 1984)
Virginia Morgan 725 F.2d 56 cocaine No
 (7th 1984)
Robert Grego, et al. 724 F.2d 701 marijuana No
 (8th 1984)
James Dowell, 724 F.2d 599 bag of cocaine No
Luther Brown (7th 1984)
Henry Herzbrun 723 F.2d 773 1 lb. cocaine No
 (11th 1984)
Gaetano Puglisi 723 F.2d 779 cocaine Yes
 (11th 1984)
Jose Gomez-Soto 723 F.2d 649 cocaine No
 (9th 1984)
Steven Saperstein 723 F.2d 1221 10 lbs. marijuana Yes
 (6th 1983)
John Armstrong 722 F.681 cocaine and No
 (11th 1984) methaqualone
Oscar Ordonez, et al. 722 F.2d 530 4 kg. cocaine No
 (9th 1983)
Paul Manfredi, et al. 722 F.2d 519 2 1/2 lbs. No
 (9th 1983) cocaine
Robert Johnson 722 F.2d 525 methamphetamine Yes
 (9th 1983)
Luis Mendoza, 722 F.2d 96 1 lbs. cocaine No
Oscar Tabares (5th 1983)
John Tehfe, et al. 722 F.2d 1114 marijuana No
 (3rd 1983)
Michael Delutis 722 F.2d 902 bag of cocaine No
 (1st 1983)
Jose Calvente, et al. 722 F.2d 1019 large quantities No
 (2nd 1983) narcotics
Oscar Torres, et al. 720 F.2d 1506 bales of Remanded for
 (11th 1983) marijuana fact finding
 (705 F.2d 1287
 (same case))
Mildred Woods, 720 F.2d 1022 2 plastic baggies No
Cathy Goldstein (9th 1983) cocaine
Ronald Thompson 720 F.2d 385 cocaine No
 (5th 1983)
Sabbatino & 720 F.2d 927 methamphetamine No
Antonio Ciammitti (6th 1983) factory
Larry Cassity 720 F.2d 451 amphetamine Yes
 (6th 1983) factory
Isaac Pinto-Mejia, 720 F.2d 248 20 tons marijuana No
et al. (2nd 1983)
Wanda Sanders 719 F.2d 882 2 lbs. marijuana; No
 (6th 1983) 2 oz. cocaine
Seth Mason, 719 F.2d 1485 drugs (unstated) No
Carl Peterson (10th 1983)
David Vaughn 718 F.2d 332 drugs (unstated) No
 (9th 1983)
Charles Poole, 718 F.2d 671 100 lbs. No
Stephen Upchurch (4th 1983) marijuana
Timothy Peyko 717 F.2d 713 25.4 grams No
 (2nd 1983) cocaine
Christopher Hall 716 F.2d 826 3000 lbs. No
 (11th 1983) marijuana
Larry Kiser 716 F.2d 1268 several drugs Remanded for
 (9th 1983) fact-finding
Donald Taylor, et al. 716 F.2d 701 amphetamine No
 (9th 1983) manufacturing
Charles Burke, 716 F.2d 935 41,000 lbs. No
Alan Quin (1st 1983) marijuana
Noble Lartey 716 F.2d 955 1.2 million Remanded for
 (2nd 1983) tablets of fact-finding
 gluthethimide
 & emprin with
 codeine
Ignacio Perez, 714 F.2d 52 unspecified drugs No
Luis Quintero (8th 1983)
Bual Shepherd 714 F.2d 316 moonshine whiskey No
 (4th 1983)
William Doty 714 F.2d 761 156 marijuana No
 (8th 1983) plants
Dorothy Jefferson 714 F.2d 689 unspecified drugs No
 (7th 1983) in large drug
 operation
Jamie Gomez-Diaz 712 F.2d 949 445 grams cocaine No
 (5th 1983)
Martin Thompson 712 F.2d 1356 vial of cocaine Yes
 (11th 1983)
Clement Kolodziej 712 F.2d 975 24 oz. cocaine; Yes
 (5th 1983) 100 lbs.
 marijuana
Alonzo Berrong, 712 F.2d 1370 marijuana farm No
Jack McKay (11th 1983)
Constanza D'Allerman 712 F.2d 100 80 balloons No
 (5th 1983) of cocaine
Gregory Foster, et al. 711 F.2d 871 heroin No
 (9th 1983)
Roberto Bernitta 711 F.2d 36 2 lbs. cocaine No
 (5th 1983)
Isaac Manchester 711 F.2d 458 cocaine No
 (1st 1983)
John Kramer 711 F.2d 789 1000 lbs. No
 (7th 1983) marijuana
Raul Freire, et al. 710 F.2d 1515 1 oz. cocaine No
 (11th 1983)
John Thompson, et al. 710 F.2d 1500 several bales No
 (11th 1983) marijuana
Harold Butts 710 F.2d 1139 marijuana No
 (5th 1983)
James Berick, 710 F.2d 1035 methamphetamine No
Timothy Culver (5th 1983) laboratory
Robert Hardin 710 F.2d 1231 cocaine No
 (7th 1983)
James Karo, et al. 710 F.2d 1433 cocaine Yes
 (10th 1983)
Gene Braithwaite, and 709 F.2d 1450 methaqualone No
Michael Stewart (11th 1983) manufacturing
Luis Mendez-Jiminez 709 F.2d 1300 102 balloons No
 (9th 1983) w/402 g. cocaine
German Ceballos, 706 F.2d 1198 27,500 lbs. No
et al. (11th 1983) marijuana
Frank Bachner 706 F.2d 1121 boxes of Remanded for
 (11th 1983) quaaludes fact-finding
Clement Kolodziej 706 F.2d 590 20 lbs. marijuana Yes
 (5th 1983)
Kenneth Whitten, 706 F.2d 1000 methamphetamine Some
et al. (9th 1983) suppressed,
 some not
Lawrence Koessel 706 F.2d 271 28.2 g. cocaine No
 (8th 1983)
Jose Gravier 706 F.2d 174 3 bags cocaine No
 (6th 1983)
Robert Walker 706 F.2d 28 10 oz. cocaine No
 (1st 1983)
Judah Lyons 706 F.2d 321 cocaine Some
 (D.C. 1983) suppressed,
 some not
Tillman Bentley, 706 F.2d 1498 methaqualone No
Nathan Platt (8th 1983)
Gilbert Wylie 705 F.2d 1388 heroin No
 (4th 1983)
Mark Wallfraff 705 F.2d 980 2.2 lbs. cocaine No
 (8th 1983)
Thomas Gaertner 705 F.2d 210 cocaine No
 (7th 1983)
Mike Fooladi 703 F.2d 180 manufacture of No
 (5th 1983) amphetamines and
 methamphetamine
Steve Ward 703 F.2d 1058 marijuana farm No
 (8th 1983)
David McGranie 703 F.2d 1213 cocaine No
 (10th 1983)
Richard Blasco, et al. 702 F.2d 1315 31,000 lbs. No
 (11th 1983) marijuana
Hubert Yonn, et al. 702 F.2d 1341 conspiracy to No
 (11th 1983) import marijuana
 
 
 
 [1]
 Because Alvarez's trial was severed from that of his co-conspirators, his is the only conviction now before us. We dealt with the appeals of four of Alvarez's co-defendants in United States v. Alfonso, 759 F.2d 728 (9th Cir.1985). The fourth amendment issue before us now was not raised by the appellants in Alfonso
 
 
 [2]
 In stating that the time interval is undisputed, we mean that it is undisputed by the parties; the dissent disputes it. The dissenting opinion proceeds on the assumption that the trial court made no findings regarding the time interval. In making its findings of exigent circumstances at the conclusion of the suppression hearing, however, the trial court found that, after the arrest of Torres, the agents learned of Mauricio and his location at 1:30, and that the later arrests at the Holiday Inn occurred, as the trial judge understood it, "sometime between 3:00 and 3:30." Suppression hearing transcript, pp. 345-46
 Even if we felt free, as we do not, to sift through the record and make new findings, resolving conflicts in the testimony, we would not arrive at the same findings that the dissent has. The record shows the following evidence regarding the times in dispute:
 Arrest of Bramlett & Torres (First two suspects)
 
 
 [1]
 Sometime after 1:00 p.m., when agents began to follow red Oldsmobile. (McCauley trial testimony, TR 88-89)
 
 
 [2]
 Twelve noon. (Hale motion testimony; suppression TR 277)
 
 
 [3]
 Prior to or approximately 1:30 (Baird trial testimony, including testimony that she debriefed Torres at about 1:30. TR 95-96)
 
 
 [4]
 Two p.m. (Hale declaration, attached to Gov't Opposition to motion to suppress)
 Interrogation of Bramlett & Torres
 
 
 [1]
 Approximately 1:30 p.m., lasting 10-30 minutes. (Baird trial testimony, TR 95-96, 100)
 
 
 [2]
 At 1:30 or 1:45. (Madden motion testimony; suppression TR 324)
 
 
 [3]
 Agents learned where Alvarez was at 1:30 p.m. (Hansen declaration, attached to Gov't Opposition to Motion to Suppress)
 
 
 [4]
 Agents learned where Alvarez was at 2:00. (Hale declaration, attached to Gov't Opposition to Motion to Suppress)
 Arrest of Alvarez at Holiday Inn
 
 
 [1]
 3:00 p.m. (Gallagher declaration, attached to Gov't Opposition to Motion to Suppress)
 
 
 [2]
 3:00 p.m. (Breen declaration, attached to Gov't Opposition to Motion to Suppress)
 
 
 [3]
 2:30 p.m. (Alvarez' trial testimony; TR 202)
 This evidence supports the view of the trial judge, the defendant, and the government that at least 90 minutes passed from the time the agents learned of Alvarez' location until his arrest.
 
 
 [3]
 Fed.R.Crim.P. 41(c)(2) provides:
 Warrant upon Oral Testimony
 (A) General Rule. If the circumstances make it reasonable to dispense with a written affidavit, a Federal magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means.
 (B) Application. The person who is requesting the warrant shall prepare a document to be known as a duplicate original warrant and shall read such a duplicate original warrant, verbatim, to the Federal magistrate. The Federal magistrate shall enter, verbatim, what is so read to such magistrate on a document to be known as the original warrant. The Federal magistrate may direct that the warrant be modified.
 (C) Issuance. If the Federal magistrate is satisfied that the circumstances are such as to make it reasonable to dispense with a written affidavit and that grounds for the application exist or that there is probable cause to believe that they exist, the Federal magistrate shall order the issuance of a warrant by directing the person requesting the warrant to sign the Federal magistrate's name on the duplicate original warrant. The Federal magistrate shall immediately sign the original warrant and enter on the face of the original warrant the exact time when the warrant was ordered to be issued. The finding of probable cause for a warrant upon oral testimony may be based on the same kind of evidence as is sufficient for a warrant upon affidavit.
 (D) Recording and Certification of Testimony. When a caller informs the Federal magistrate that the purpose of the call is to request a warrant, the Federal magistrate shall immediately place under oath each person whose testimony forms a basis of the application and each person applying for that warrant. If a voice recording device is available, the Federal magistrate shall record by means of such device all of the call after the caller informs the Federal magistrate that the purpose of the all is to request a warrant. Otherwise a stenographic or longhand verbatim record shall be made. If a voice recording device is used or a stenographic record made, the Federal magistrate shall have the record transcribed, shall certify the accuracy of the transcription and shall file a copy of the original record and the transcription with the court. If a longhand verbatim record is made, the Federal magistrate shall file a signed copy with the court.
 (E) Contents. The contents of a warrant upon oral testimony shall be the same as the contents of a warrant upon affidavit.
 (F) Additional Rule for Execution. The person who executes the warrant shall enter the exact time of execution on the face of the duplicate original warrant.
 (G) Motion to Suppress Precluded. Absent a finding of bad faith, evidence obtained pursuant to a warrant issued under this paragraph is not subject to a motion to suppress on the ground that the circumstances were not such as to make it reasonable to dispense with a written affidavit.
 
 
 [4]
 We recognize that the arrest in this case occurred before we announced our decision in Manfredi. Nonetheless, Fed.R.Crim.P. 41(c)(2) has been in force since October 1977. To date, it apparently remains a largely ignored provision, at least according to representations of the U.S. Attorney at oral argument in this case. Counsel could not answer our questions concerning the government's experience with telephone warrants apparently because the procedure outlined in Rule 41(c)(2) is simply not used in the Central District of California
 
 
 [5]
 We reiterated our concern over the apparent refusal of law enforcement officers to utilize a telephone warrant procedure in United States v. Wulferdinger, 782 F.2d 1473, 1476-77 (9th Cir.1986). In that case, officers failed to employ California's telephone warrant procedure, outlined in Cal. Penal Code Sec. 1526(b) (West 1982). Again in that case, we concluded that "the exigency was extreme enough" to excuse the government's failure to secure the telephone warrant. Wulferdinger, 782 F.2d at 1477. We did not, as the government asserts, hold that one hour (or any other specific amount of time) was per se insufficient to secure a telephone warrant. In fact, the police in Wulferdinger had considerably less than an hour to act. Further, evidence in the record showed a clear need for immediate police action, and officers responded right away. Moreover, we pointed out that officers would have had "to locate a magistrate and a court reporter late at night to hear and record the officer's sworn statement...." Id. In light of the totality of the circumstances, we concluded that " 'the time required, however short, was not available.' " Id. (quoting United States v. Manfredi, 722 F.2d 519, 523 (9th Cir.1983))
 
 
 [6]
 The requirement that the government attempt, in good-faith, to secure a warrant should dispose of government concerns that magistrates are not always available to approve warrant applications, even by telephone
 
 
 [7]
 As the Supreme Court recently reiterated in Leon:
 "[G]ood faith on the part of the arresting officers is not enough." Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.
 Leon, 468 U.S. at 915 n. 13, 104 S.Ct. at 3417 n. 13 (quoting Beck v. Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964)).
 
 
 [8]
 The government does not, and could not, contend that the fourth amendment violation here was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)
 
 
 [9]
 The dissenting opinion undertakes to show, by a review of federal appellate cases, that there are great uncertainties and inconsistencies in the application of the exclusionary rule. If the point of this discussion, and of the detailed description of the defendant's criminal activity, is that the disputed evidence in this case was properly admitted even if the arrest violated the fourth amendment, we reject that surprising and unsupported suggestion
 It is true that in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that exclusion need not follow every violation of the fourth amendment. The issue in Leon, however, was whether it was proper to use evidence obtained by officers in good faith reliance upon a warrant, and the Court's ruling was based to a substantial extent on a preference for reliance on warrants rather than on the officers' own hasty judgments. Id. at 913-14, 104 S.Ct. at 3416-17. Leon made it clear that there will be occasions for the legitimate application of the exclusionary rule even when a warrant was obtained. Id. at 922-23, 104 S.Ct. at 3421-22. Surely when the arrest or search is effected without a warrant and violates the fourth amendment, evidence directly resulting from the arrest or search should be suppressed at trial, and the requirement of suppression should be enforced on direct appeal of a conviction. To create an exception to the exclusionary rule based, as the dissent hints that it should be, on the seriousness of the crime or the reprehensibility of the defendant's conduct, would be to obliterate the rule. Such a result is consistent with neither the holding nor the language of Leon, nor is it supported by any other authority of which we are aware.
 
 
 [1]
 See Appendix