**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Oscar TORRES, Daniel Narvaez, and Javier Dario Gomez, Defendants-Appellants.**

**No. 81–5827.**

United States Court of Appeals, Eleventh Circuit.

Sept. 17, 1984.

**1324**

Weiner, Robbins, Tunkey & Ross, William Tunkey, Geoffrey C. Fleck, Miami, Fla., for Torres and Narvaez.

Bruce H. Fleisher, Coral Gables, Fla., for Javier Dario Gomez.

Robert J. Bondi and Jon May, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.

PER CURIAM:

In our most recent opinion, *United States v. Torres*, 720 F.2d 1506 (11th Cir. 1983), we reversed the district court's ruling that appellants Torres and Narvaez lacked standing to challenge the warrant-less entry and search of the house in which they were arrested, remanded for further findings of fact, and retained jurisdiction. The district court's Order on Remand, dated January 17, 1984, having been filed in this court, and the case resubmitted to this panel, we now decide appellants' Fourth Amendment and sufficiency-of-the-evidence claims.[1]

At the suppression hearing below, appellants presented the affidavit of Alexander McLaughlin, the purported owner of the house, who stated that appellants had been given permission to stay in, and had access to all areas of, the house. Appellants testified that McLaughlin had given them permission to stay in the house and that they had been there for two days prior to their arrests. In addition, Torres testified that he and Narvaez had been on a fishing trip and that he believed McLaughlin to be the owner of the house. Concluding that appellants had failed to meet their burden of establishing a legitimate expectation of privacy in the house, the district court denied their motion to suppress.

From the Order on Remand, appended to this opinion, it is now clear that the district court's ruling did not rest on the conclusion that the situation described by appellants, if found as fact, would not support a legitimate expectation of privacy. Rather, the court based its ruling on its finding that the evidence introduced by appellants was unworthy of belief. Under the heading "Findings of Fact As to Defendants' Expectation of Privacy," the court stated:

> Having considered the Defendants' demeanor as well as the content of the evidence they presented, I find that the testimony in support of the Defendants' claim of standing is not credible.
>
> \*   \*   \*   \*   \*   \*
>
> I give no credence to the McLaughlin affidavit.
>
> \*   \*   \*   \*   \*   \*

---

1. Our decision today, of course, in no way affects our previous affirmance of Gomez's conviction. *See* 720 F.2d at 1510–11.

While the Defendants did come forth with evidence in support of their claim, I find that this evidence was not credible and unworthy of belief. I therefore find that the Defendants did not have a legitimate expectation of privacy in the residence searched.

Order on Remand at 1327–1328. Because the district court offered ample support for its credibility determination in this case, we accept the court's conclusion that appellants failed to establish the requisite expectation of privacy. Thus we hold that the district court did not err in denying appellants' motion to suppress.

▮▮▮ With regard to the sufficiency-of-the-evidence claims, we must sustain appellants' convictions if, taking the view most favorable to the government, a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc), *aff'd on other grounds,* 459 U.S. 1034, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). A review of the record, including the evidence which the district court properly refused to suppress, demonstrates that the jury might have reasonably concluded that the evidence established appellants' guilt beyond a reasonable doubt. Accordingly, we affirm their convictions.

AFFIRMED.

APPENDIX

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

OSCAR TORRES and
DANIEL NARVAEZ,

Defendants.

Case No.: 81–136–Cr–JWK.

·ORDER ON REMAND

On December 12, 1983, the Eleventh Circuit Court of Appeals ordered that this case be remanded to the District Court so that the Court could clarify its previous finding that the Defendants Torres and Narvaez lacked standing to contest the entry of a residence in which they and eight bales of marijuana were found. Upon review of the record, this Court adheres to its original ruling for the following reasons:

I. *Factual Setting.*

Sometime during the latter part of February or the beginning of March of 1981, Customs Patrol Officer Thomas Arnold received information from a confidential informant that a marijuana offload would occur near Gallagher's Dock in Tavernier, Florida. [MS. 8, 47, 48]. The informant told Arnold that an unknown quantity of marijuana would be arriving in two vessels. [MS. 52].

In response to this information, various agents of the Drug Enforcement Administration, the United States Customs Service, and other police agencies initiated surveillance in the vicinity of Gallagher's Dock. The surveillance post consisted of a Winnebago camper equipped with radar and night scopes. [MS. 18, 22]. The Winnebago was located approximately three hundred yards from Gallagher's Dock, in a location where it was not possible to see the dock itself. [MS. 25]. At approximately 1:30 A.M. on the morning of March 22, 1981, Customs Agent Thomas Arnold and other agents inside the Winnebago saw on their radar screen two "blips," representing two motor vessels entering the bay. [MS. 9, 57]. The two vessels were spotted approximately two and one-half miles from land after they had entered the bay. Agent Arnold, through the use of a night scope, was able to ascertain only that the first vessel was larger than the second vessel, and that the second vessel was, in his opinion, following behind the first. [MS. 24].

When first observed, both vessels had their running lights on, but as they approached Tavernier Key their lights were switched off. [MS. 57; T. 90, 117]. Shortly after it had switched off its lights, the smaller vessel turned around and left the

bay. The larger vessel, a white Sports Fisherman, thereafter proceeded toward Gallagher's Dock [MS. 60], the only dock in the area. [T. 91]. Officer Arnold, who remained at the Winnebago position, observed this vessel come out from the Gallagher's Dock area approximately thirty minutes later. [T. 91]. Using a Customs patrol vessel, Officer Arnold intercepted this larger vessel, ALEJANDRA I, and found codefendants Gonzalez and Gutierrez on board. [T. 93–96]. Marijuana residue was found on the stern area of the deck and in the bilge area. A "brick" of marijuana was found on the dash of the vessel. [T. 97].

Prior to the departure of the ALEJANDRA I, Deputy Sheriff Thomas Warwick had observed a truck drive into Harry's Restaurant nearby. Warwick observed an individual exit the truck and enter a brown van. Both vehicles then proceeded to Gallagher's Dock. [T. 162]. Within one-half hour, first the truck and then the brown van were observed leaving Gallagher's Dock. [T. 163, 184–85]. The truck proceeded north on U.S. 1 [T. 184–85] where it parked at an address on Atlantic Street. [T. 186].

While maintaining a surveillance position to observe any activity near the truck [T. 186–87], Special Agent Jasper Mateer saw the brown van enter the Atlantic Street area, near where the truck was parked. After ten minutes, the brown van left and was followed by Agent Mateer to 226 Buttonwood Lane. [T. 188]. Agent Mateer observed at least one individual exit the brown van and enter the house located at that address (referred to at trial as "Captain Al's" place). [T. 214–15].

Agent Mateer then returned to the Atlantic Street location where the Ford truck remained parked. [T. 188]. Agent Mateer approached the truck and, in doing so, smelled marijuana. [T. 189]. The "roll-up door" of the truck was open about 10–12 inches when Agent Mateer approached the truck. [T. 256]. Defendant Gomez's legs were observed standing in front of approximately 52 bales of marijuana [T. 189] which

weighed approximately 1,606 pounds. [T. 258–59]. Gomez did not possess any keys to the truck. [T. 244].

After Gomez had been arrested, agents went to an adjacent house and spoke with a resident, who informed the agents that he had given permission to a friend, named "Captain Al," to park the truck in his yard. A yellow receipt for repair work, with the name "Captain Al" on it, was given to the agents by the occupants of the house. [MS. 78]. The agents were aware that a person named "Captain Al" lived on Buttonwood Lane, several miles away; they decided that they should make a trip to the home of "Captain Al." [MS. 79].

The agents positioned themselves on Buttonwood Lane and approached the property line of "Captain Al's" (Alexander McLaughlin's house). The house itself sits toward the end of a street, which culminates in a cul-de-sac. As the agents approached the driveway of the house, they observed an individual walking toward them from the front of the house. This man was later identified as co-defendant Parker. Agent Mateer observed the brown van, which he had previously seen, in front of the house and saw bales of marijuana through its windows. [MS. 80]. Marijuana residue, pieces of burlap, leaves and seeds were strewn from the front of the van to the house. [MS. 80]. Marijuana residue was also observed on the steps going into the house. [MS. 82].

As Parker approached the officers, he was asked if he was "Captain Al." He responded that he was not. [MS. 80]. He produced identification upon demand. He was asked whether other persons were in the house; he stated that two other persons were in there, but that he was not aware of their names. [MS. 80]. Parker explained that he had been doing carpentry work for the owner of the house and that he was waiting for the owner, "Captain Al," to return. Parker was thereafter placed under arrest. [MS. 81].

II. *Findings of Fact As To Defendants' Expectation of Privacy.*

The agents proceeded to the front doorway of the house. The house searched was

a private home. The search of that home occurred at approximately 1:30 A.M. In order to get to the front door, the agents were required to first pass through an enclosed entranceway and to proceed from there up a small set of steps to the front door of the house. As Agent Mateer proceeded to walk into the house, he called out, "It's the police. Is there anybody in the house? Would you come where I can see you?" [MS. 183]. In response to this announcement, Defendants Narvaez and Torres presented themselves. [MS. 83]. Narvaez had been cooking in the kitchen. Torres came to the front of the house from the rear bedroom and bathroom area.

Once inside (after having passed through an entranceway and the door), Agent Mateer noticed in a corner of the living room a pile of clothing which appeared to have a leafy residue on it. Both Narvaez and Torres were wearing "brand new jeans," no shirt or shoes and had wet hair, "as if they had just stepped out of the shower." [MS. 83, 195]. Both Defendants were immediately placed under arrest. [T. 231; MS. 93]. Later, Narvaez asked for permission to put on shoes which were in the hallway near the next room. He was followed there by Agent Mateer, at which time eight small bales (fifteen to twenty pounds each) were found in a nearby bedroom. [MS. 84]. An inventory of their personal effects uncovered $1,192 in cash on Torres [T. 197] and $462 in cash on Narvaez. [T. 200].

At the hearing on the Defendants' motion to suppress, the Defendants presented both documentary as well as testimonial evidence in support of their claim of standing. Initially, the Defendants presented an affidavit from the purported owner of the residence, Alexander McLaughlin. In this affidavit, McLaughlin stated that Torres and Narvaez had his permission to stay in, and had access to, all areas of the house. Torres testified that he and Narvaez were on a fishing trip and both men testified that by the time the police arrived they had been at the McLaughlin residence for two days. Torres also stated that he believed McLaughlin to be the owner of the residence. Both Narvaez and Torres testified that McLaughlin had given them permission to stay at the house.

Having considered the Defendants' demeanor as well as the content of the evidence they presented, I find that the testimony in support of the Defendants' claim of standing is not credible. The testimony presented by the Government at the suppression hearing demonstrated beyond any question that the Defendants were involved in a narcotics smuggling operation. The Defendants were found inside a residence which contained eight bales of marijuana. A van, filled with marijuana, was parked outside, and a trail of marijuana led from the van, up some steps, and into the residence itself. When arrested, both Defendants were found to be freshly showered and wearing clean clothes. A pile of clothing with marijuana residue on it was discovered in the living room. From the foregoing, I conclude that the Defendants were not on a fishing trip.

Had the Defendants been truthful regarding the purpose of their stay, this Court would be more inclined to believe their testimony that they had been staying at the house for two days. Having lied about the purpose of their stay, this Court has no reason to believe the Defendants' testimony regarding the length of that stay. This conclusion is bolstered by the Defendants' testimony on cross examination. When questioned whether they had clothes at the house, Torres replied that their changes of clothing were at the cleaners. When asked if he came and went as he pleased, Torres replied, "Yes, but most of the time we don't know our way around. He [McLaughlin] takes us." [MS. 40]. When asked a similar question, Narvaez said, "The only time I left the house was when Mr. McLaughlin took us out." Narvaez also testified that the only time he entered the McLaughlin residence was when McLaughlin was present. [MS. 45–46].

From the above testimony it is impossible to determine how long the Defendants were present at the house before the police arrived. However, this Court is not willing to believe that the Defendants were

present for two days particularly in view of their testimony that they could not enter the McLaughlin residence unless McLaughlin was present and would not leave the McLaughlin residence unless McLaughlin took them out. These men were obviously brought in to perform a job. Outside of their own highly suspect testimony, there is no evidence that they were present for any period of time longer than that which was necessary to do that job.

Even if this Court were to believe that the Defendants were on a fishing vacation and had been at the McLaughlin residence for two days, this Court would still not believe that the Defendants had a legitimate expectation of privacy in the residence. Although Torres testified that they had unlimited access to the house, he also testified that he was not given a key. [MS. 42]. Also, Torres was apparently contradicted by Narvaez who stated that their access was limited to the porch and a parlor (presumably the living room). [MS. 45–46].

I give no credence to the McLaughlin affidavit. The affidavit is hearsay and while admissible at a suppression hearing, it was prepared by an individual who may himself have been involved in the smuggling operation. The Ford truck, occupied by Gomez and the marijuana, was parked on Atlantic Street at McLaughlin's request. The affidavit is on its face suspect.

In Paragraph 2 of the affidavit, McLaughlin states that he resides at 226 Buttonwood Lane in Tavernier, Florida. In Paragraph 3, he states that he resided at that address during the entire month of March 1981. In Paragraph 4, he states that on or about March 20 or 21, 1981, he gave the Defendants permission to stay in his house and consented to their access to all areas of the house. In Paragraph 5, he notes that the Defendants were living in his house on those dates. In Paragraph 6, however, he states that the Defendants had a right of access to the home "during the entire period commencing on April 21, 1981 through, to and including April 22, 1981." While this discrepancy in dates may have been the result of a typographical error, in my opinion, it diminishes its trustworthi-

ness. In view of the fact that McLaughlin did not himself testify, the Court has no reason to trust this document.

A defendant who claims the protections of the Fourth Amendment has the burden of establishing his legitimate expectation of privacy in the place invaded. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 423 n. 1, 58 L.Ed.2d 387 (1978); *United States v. Meyer*, 656 F.2d 979 (5th Cir. 1981). While the Defendants did come forth with evidence in support of their claim, I find that this evidence was not credible and unworthy of belief. I therefore find that the Defendants did not have a legitimate expectation of privacy in the residence searched.

**IT IS HEREBY ORDERED AND ADJUDGED** that Defendants' Motion to Suppress Evidence be and the same is hereby denied.

**DONE AND ORDERED** this 17th day of January, 1984.

/s/ James W. Kehoe
James W. Kehoe
United States District Judge