UNITED STATES of America, Plaintiff–Appellee,

v.

Ronald TOBIN, Clifford Roger Ackerson, Defendants–Appellants.

UNITED STATES of America, Plaintiff–Appellee,

v.

Ronald TOBIN, Defendant–Appellant.

Nos. 87–6015, 88–5274.

United States Court of Appeals, Eleventh Circuit.

Nov. 22, 1989.

Samuel Burstyn, Robert F. Dunlap, Miami, Fla., for defendants-appellants.

Dexter W. Lehtinen, U.S. Atty., Edward C. Nucci, Linda Collins Hertz, Dawn Bowen, Asst. U.S. Attys., Miami, Fla., for U.S.

Before CLARK and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

CLARK, Circuit Judge:

In these appeals we face the difficult task of further defining the parameters of the Fourth Amendment. Both appellants, Ronald Tobin and Clifford Ackerson, appeal the denial of their motions to suppress evidence seized at Ackerson's home on March 19, 1986. We find that Tobin lacks standing to challenge either the search of Ackerson's home and garage or the search of the car found inside of the garage. We further find that the search of Ackerson's home was illegal because Ackerson opened the door to his residence in acquiescence to a show of official authority. Thus, Ackerson's motion to suppress should have been granted. The district court's order is therefore affirmed in part and reversed in part.

## I. FACTS

On March 19, 1986, U.S. Customs Special Agents Wayne Roberts and Gerald O'Neil and Drug Enforcement Administration Special Agents Steven Widener and Charles Cecil were conducting a surveillance in the area of 104th Street and Southwest 144th Court in Miami, Florida. They were in a

field northwest of the front of appellant Clifford Ackerson's house. This surveillance was initiated pursuant to an investigation unrelated to the appellants in this case.

At about 3:30 or 4:00 p.m., Agent Roberts' attention was drawn to a Mercury Marquise traveling on 144th Street. This car attracted his attention due to the manner in which it turned and traveled up the street, and Agent Roberts began watching it because it was similar to one he had followed earlier in the day as part of the unrelated surveillance.

Agents Roberts and Widener saw the car quickly stop in the middle of the street and back into the driveway of the residence at 10411 S.W. 144th Court. There was already a pickup truck parked in the front yard of that house. Appellant Ronald Tobin then jumped out of the car, looked around, and ran to the front door of the residence. Tobin knocked and within one minute, Ackerson admitted him to the house. Shortly after Tobin entered the house, the garage door was opened three-quarters of the way by Ackerson, who looked up and down the street while holding the door. Tobin also peered out of the garage and, looking up and down the street, he crouched down and eased out of the garage. Tobin then used a key to open the trunk of the car he had parked in the driveway. He took three full tubular plastic bags out of the trunk and very quickly put them into the garage. The bags were about four feet long and were covered in heavy clear plastic wrapping, with smaller packages inside. Tobin again looked up and down the street and immediately hopped back into the garage. During this time the agents observed the front of another vehicle which had been backed into the garage. The agents were able to make these observations because they were using binoculars. Based on their experience, both Agents Widener and Roberts suspected that Tobin had put cocaine into the house.

The agents decided to go to the door, and to talk to the occupants of the house in the hopes of securing a consent search. Three of the agents pulled up to Ackerson's house in their own individual vehicles. Agent Roberts went to the front door accompanied by Agent O'Neil who served as a backup for security purposes. Agent Widener went to the corner of the house along the southern wall of the house's exterior and the garage door and stood there with his gun raised. Although there is no direct evidence, Widener was apparently out of sight because he could not see the front door from where he was positioned.

Agent Roberts knocked on the door and initially received no answer. He continued to knock for three to four minutes as he shouted in English and in Spanish, "I'm a police officer, I would like to talk to you, I need for you to come here." One of the agents began to call for uniformed back-up but stopped when Ackerson finally answered the door. When the door was opened, Agent Roberts displayed his credentials and told Ackerson he was a Customs Agent. Roberts stated that he had reason to believe someone had just put cocaine into Ackerson's garage and that he would like to talk to Ackerson about the car that Tobin had backed into the driveway.

Initially, Ackerson denied that anyone had backed up to his garage door in a car or that anyone else was in his home. During this conversation with Ackerson, Agent Roberts could smell the odor of marijuana coming from inside the house. Ackerson finally called Tobin to the front door. When Tobin appeared, Agent Roberts again identified himself and told Tobin he wanted to talk to him about the car Tobin had backed into the driveway. Both Agent Roberts and Tobin were outside the door of the house. Tobin said that he had not driven there. When Agent Roberts explained that he had witnessed Tobin take bags out of the trunk of the car by the garage door and place them inside the garage, Tobin denied it.

Agent Roberts then stated that he believed Ackerson and Tobin were "up to something." Roberts stated that they all should go to the garage and see what was there. At that time, Ackerson, who was standing in the doorway of the house,

turned and walked inside the house towards the garage. Agent Roberts followed, along with Tobin and Agent O'Neil to the rear. All four individuals proceeded directly to the garage. Once inside the garage, Agent Roberts asked Ackerson to open the garage door. Ackerson proceeded around the passenger side of a Mercury station wagon bearing an Oregon license plate which had been backed into the garage and opened the garage door.

As the door went up, Agent Widener, who was standing outside on the driveway with his gun drawn, reholstered the gun and saw the tubular bags he had seen earlier when they had been moved into the garage and thrown on the floor by Tobin. One bag had been pulled farther in than the others, and two or three of the smaller packages had been taken out of the bigger bag and were lying on the ground. One package was open. When Agent Widener realized that the packages spread out in front of him contained cocaine, he reported that fact to Agent Roberts who initially believed, given the smell of marijuana, that perhaps Widener was mistaken and it was marijuana in the garage. The elapsed time from the arrival of Agent Roberts at the front door to the discovery of the cocaine was between ten and fifteen minutes. Prior to finding the cocaine, Agents Roberts and O'Neil had their guns unholstered but not drawn.

After discovery of the cocaine, Tobin and Ackerson were placed under arrest. Agent Roberts asked Ackerson if anyone else was in the house and Ackerson said "no." Because Ackerson had not only lied about Tobin's presence in the house a few minutes before, but also because there were three vehicles on the premises and only two persons had been located, Roberts was not satisfied with Ackerson's answer. To ensure their own safety, Agents Roberts and O'Neil did a security sweep of the house. During this security sweep, the agents found three bales of marijuana in the shower stall of the master bedroom's bathroom. The agents then conducted a more general search, opening drawers in the master bedroom and looking under the couch cushions in the living room.

While inside the garage, Agent Widener noticed through the windows of the station wagon parked there that all of the screws had been removed from the floorplate over the wheel well in the back of the vehicle. Tobin and Ackerson had been arrested and the security sweep had been conducted. Agent Widener searched the station wagon. Upon opening the back gate and lifting up the plate in the station wagon, Agent Widener saw brown paper grocery bags inside. Based upon his experience with the way drug money is handled and his belief that a drug deal was occurring, Agent Widener believed the bags contained money. While holding the plate with one hand, Agent Widener pulled the top of one paper bag back with the other hand, revealing U.S. currency. Later, it was determined that the cash totaled approximately $775,000.

After the cocaine had been found on the garage floor, the defendants were given their *Miranda* warnings. Prior to either defendant invoking his *Miranda* rights, the agents learned from Ackerson that he owned the house. Tobin, on the other hand, told the agents that he did not live in the house. Both defendants denied any knowledge of the cocaine or possession of the marijuana. Both defendants indicated that they had no knowledge of and did not own the station wagon with Oregon tags in Ackerson's garage. Similarly, both Ackerson and Tobin denied knowledge and ownership of the money found in the station wagon in the garage. Nonetheless, the keys to the station wagon in the garage were found in Tobin's possession. A subsequent check by the DEA showed that the station wagon parked in Ackerson's garage on March 19th and bearing Oregon plates was registered to Ellen P. Mekulich of Tigar, Oregon, a suburb of Portland, as of March 3, 1986. Prior to that the station wagon's owner had been a Ben Chrystal of Portland, Oregon.

## II. DISCUSSION

Both appellants Tobin and Ackerson claim that the agents gained entry to Ack-

erson's home only through a show of official authority. Thus, the appellants allege that the agents conducted a "search" within the meaning of the Fourth Amendment when Ackerson opened the door. Without probable cause and exigent circumstances, the appellants contend that this search was illegal. The government counters that the agents, as part of an investigation, knocked on the door, called out their identities and requested to speak to the occupants. According to the government, these actions did not amount to a command and Ackerson's opening of the door was therefore voluntary. Thus, argues the government, at that point no "search" occurred within the meaning of the Fourth Amendment and the agents lawfully obtained the smell of the marijuana as evidence in "plain view." Before we discuss the merits of these arguments, we must first address Tobin's standing to challenge the search at issue.

## A. STANDING

In *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), the Supreme Court held that under the Fourth Amendment, courts should analyze standing "within the purview of substantive Fourth Amendment law." Thus, our inquiry into Tobin's standing proceeds directly to the substantive question of whether the challenged search and seizure violated his Fourth Amendment rights. In other words, we ask whether Tobin possessed a legitimate expectation of privacy in the premises searched or in the items seized. *United States v. Rackley*, 742 F.2d 1266, 1270 (11th Cir.1984). A legitimate expectation of privacy is an expectation actually and subjectively held by the defendant and one which society is prepared to recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

The appellants allege that, under the totality of the circumstances, Tobin had a legitimate expectation of privacy in the house. First, he provided Ackerson with the money to keep up the mortgage payments when Ackerson was injured and could not work; second, Tobin made substantial use of the house; and finally, the appellants allege that Ackerson gave Tobin the primary use of his garage. The government counters that even accepting the appellants' assertions, Tobin did not demonstrate any proprietary interest in the house nor did he establish an *unrestricted* right of occupancy to the premises. Without such proof, argues the government, Tobin lacks the privacy interest necessary to challenge the search.

The burden of establishing a legitimate expectation of privacy in the searched premises lies with the individual asserting the Fourth Amendment violation. *Rakas*, 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1. Accepting the district court's factual findings with regard to Tobin's privacy interests in Ackerson's house, we agree with the government and the district court that Tobin has failed to meet this burden. First, the district court accepted Ackerson's testimony that Tobin loaned Ackerson money for the house after Ackerson had been injured in a motorcycle accident and could not work. The district court also found that Ackerson meant to pay Tobin back whenever the house was sold. The court concluded, however, that this sort of "loan" does not create a possessory interest. We agree.

A mere financial interest in certain property does not confer Fourth Amendment standing in that property. *See United States v. McConnell*, 500 F.2d 347 (5th Cir.1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424 (1975) (defendant could not challenge search of car leased to co-defendant even though defendant had paid for rental car with his own credit card). Legal title to the house lies with Mr. and Ms. Ackerson. Tobin has never asserted either legal or equitable title to the house. In fact, he never even stipulated that the money he gave to Ackerson was to be repaid. Any agreement between Ackerson and Tobin that Tobin would be repaid from the proceeds of the house upon its sale was both indefinite and informal. Thus, Tobin has not established a possessory interest in the searched house.

Tobin may nonetheless challenge a search of the house if he can show that he had an unrestricted right of occupancy in the premises which included the right to exclude others. *United States v. Sarda–Villa*, 760 F.2d 1232, 1236 (11th Cir.1985); *United States v. Torres*, 705 F.2d 1287, 1294–95 (11th Cir.), *vacated in banc, consideration pending remand to panel*, 718 F.2d 998 (11th Cir.), *remanded*, 720 F.2d 1506 (11th Cir.1983), *on appeal after remand*, 741 F.2d 1323 (11th Cir.1984) (defendants would have standing if they had unencumbered right to access of premises and were overnight guests). As to this issue, the district court accepted the fact that Tobin used the house from time to time. Indeed, Ackerson testified that Tobin had personal items in the house and that Tobin frequently stayed overnight. Nonetheless, the district court found that Tobin used the house more frequently in the years of 1984 and 1985 before Ackerson remarried. After Ackerson's remarriage, the district court found that, because there was no guest room, Tobin stayed in the house only on those week-ends that the Ackersons were away.

The search in question occurred on a Wednesday. Tobin was not alone at the house on the day in question, but was admitted by Ackerson after knocking on the door. Tobin had not stayed at the house the night before and the district court found that he could not have been planning to stay there on the night of the search. Although Ackerson testified that Tobin had a key to the house, Tobin did not use the key to enter the house and the agents did not find any such key in Tobin's possession.

"What is a reasonable expectation of privacy is by definition related to time, place and circumstances." *United States v. Vicknair*, 610 F.2d 372, 380 (5th Cir.), *cert. denied*, 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1980). Thus, in *Vicknair*, this court held that while the owner of a boat had given each of his sons permission to use the boat, none of the sons were residing aboard it when the boat was searched. Furthermore, none of the sons testified that he had used the boat as either a temporary or a permanent residence. As a result, we found that none of the defendants had a legitimate privacy interest in the vessel. Likewise, in the present case, Tobin, who may have been in a position to assert a Fourth Amendment right to Ackerson's house had the agents come to the house during one of the week-ends that Ackerson was away and Tobin was staying there, was not in such a position on the day of the search.

This situation differs from *United States v. Jones*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) in which the Supreme Court found that the defendant had a privacy interest in his friend's apartment. In that case, the defendant had slept in the apartment the night before, had the key to the apartment while the friend was away, had stored his personal belongings there and, due to his friend's absence, had the exclusive right to exclude others. In the instant case, Tobin was not an overnight guest and did not admit himself with his key on the day in question. Thus, at that particular time, he had not adopted the residence as his own. *See also Torres*, 705 F.2d at 1294–95 (where appellants were houseguests of searched house, ate, slept and showered there, stored personal belongings there and were the only guests in house at time of search, appellants would have standing to challenge search); *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir.1984) (although appellant had more than tenuous interest in searched apartment, appellant had no standing where connections were not regular or personal enough to find that appellant adopted apartment as a place of business or as a residence).

Indeed, this case is analogous to *Rackley*, 742 F.2d 1266. In *Rackley* we held that although the appellant had the key to a house and had stayed there several times during the month of June, the appellant never kept a full wardrobe there and was not staying at the house during the time frame of the search. Under these circumstances, this court held that the appellant did not have a legitimate expectation of privacy in the house on the day in question.

Likewise, we find that Tobin simply has not established that he had an "'unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence.'" *Sarda–Villa*, 760 F.2d at 1236 (citation omitted).

■ Furthermore, Tobin has not established that he had a legitimate expectation of privacy in the garage. The fact that Tobin stored items in the garage is not the type of significant interest that confers standing to challenge the search of an area. In *United States v. Meyer*, 656 F.2d 979 (5th Cir.1981), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984), this court held that the defendant must establish a legitimate expectation of privacy *in the particular area searched* in order to have standing to challenge a particular search or seizure (emphasis added). Therefore, Tobin's expectation of privacy in the garage cannot depend on his status as an occasional overnight guest. *See Rackley*, 742 F.2d at 1270. Instead, he must establish an independent expectation of privacy in the garage.

Nothing in the record persuades us that Tobin had any reasonable expectation of privacy in the whole garage rather than only in the items he stored in the garage. Ackerson testified merely that Tobin sometimes parked his or his girlfriend's cars in the garage and that he also kept some boxes there. Ackerson further testified, however, that the Ackersons also stored items in the garage, such as his children's bicycles. Moreover, the entire Ackerson family had access to the garage through the door in the kitchen. In fact, the only way to gain access to the garage is through the door of the house because the key to the outside door had been lost. While Ackerson testified that Tobin asked Ackerson to keep anyone from "messing" with the cars parked in the garage, there was no understanding that others would not be allowed access to the garage itself. Finally, Tobin disclaimed any possessory interest in either the cocaine or the station wagon found in the garage. Thus, while Tobin might have had a subjective expectation that the things stored in Ackerson's garage would be kept private, he had no way to insure that the garage itself would be protected from intrusion. *Cf. Meyer*, 656 F.2d at 981 (certain areas, like bathroom cabinets, are not areas of dwelling place in which visitors normally have an expectation of privacy). We agree with the district court that:

> although Tobin may have had an expectation of privacy in the [pockets of the] suits he allegedly left in the closet, in the [closed] shave kit he allegedly left somewhere in the house and [in] the sealed boxes he allegedly left in the garage, he has failed to establish that he had a legitimate expectation of privacy in the floor of Ackerson's garage or [in] the shower stall in the bathroom.

D.Ct. Order at 52.

■ Turning finally to the question of whether Tobin had a legitimate expectation of privacy in the station wagon found in the garage, we hold that he does not. Tobin did not testify at any of the suppression hearings, but the testimony of the agents was that Tobin denied any knowledge of the vehicle and denied owning it. The agents eventually found a set of keys to the station wagon in Tobin's pocket but Tobin stated that he did not know if these keys were the ones to the car. After a search of the automobile produced cash, both defendants also denied knowledge of the currency. The government produced evidence that the car belonged to an individual in Oregon. The only testimony supporting Tobin's expectation of privacy came from Ackerson. He testified that although he did not know if Tobin owned the car, Tobin had parked the station wagon in the garage several weeks ago and told Ackerson not to let anyone "mess with it."

■ Even if Ackerson's testimony were enough to establish that Tobin had a legitimate expectation of privacy in the vehicle, we find that Tobin abandoned this expectation when he disclaimed any knowledge or interest in the car. "This Court has ruled that disclaiming ownership or knowledge of an item ends a legitimate expectation of privacy in that item." *United States v. Hawkins*, 681 F.2d 1343, 1345 (11th Cir.),

*cert. denied,* 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982). In *Hawkins,* we held that the appellant did not have a legitimate expectation of privacy in a suitcase to which the appellant disclaimed any interest. *See also United States v. McKennon,* 814 F.2d 1539 (11th Cir.1987) (no legitimate expectation of privacy when appellant disclaimed any knowledge of individual carrying seized suitcase before the suitcase was searched and then further disclaimed any interest in the suitcase after the suitcase was searched).

■ Although not every disclaimer of ownership will result in the abandonment of a Fourth Amendment interest, Tobin's actions were clearly enough. Tobin did not own or lease the car and the agents had seen him drive up to the house not in the station wagon but rather in the sedan parked outside of the garage. Thus, except for the keys found in Tobin's pocket, nothing even links Tobin to the station wagon. Indeed, having the keys to a car or even driving the car would not be sufficient to establish a property or possessory interest in the car unless the suspect also claimed such an interest. *Cf. United States v. Miller,* 821 F.2d 546, 548–49 (11th Cir.1987) (driver of borrowed car had standing to challenge search where driver consistently asserted that he had borrowed the car with owner's permission); *United States v. Costner,* 646 F.2d 234 (5th Cir. Unit A 1981) (where defendant never asserted a legitimate expectation of privacy in a car in which he was a passenger, defendant has no standing to challenge search of that car). Thus, this case is distinguishable from *United States v. Hall,* 716 F.2d 826 (11th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 840 (1984), where this court found that the defendant had not abandoned his interest in a Ryder truck parked in a legal space at a shopping mall. Although the defendant suspected he was being followed and did not have the keys to either the cab or the storage area, the truck was currently leased to him and he never denied ownership of the vehicle. In this case, by contrast, Tobin had no property interest in the station wagon and he denied any interest in

the car. Under these circumstances, we find that Tobin abandoned any privacy interest in the car that he might have otherwise had.

■ In sum, we hold that Tobin lacks a legitimate expectation of privacy in either the house or the garage where he was not an overnight guest on the day of the search and where he did not own, lease or have the right to exclude others from the garage. In addition, he lacks a legitimate privacy interest in the station wagon found inside the garage. Thus, Tobin may not challenge the propriety of the agents' search and the part of the district court's order denying Tobin's motion to suppress is affirmed. The disposition of Tobin's claim, however, does not end this case. As legal owner of a private home, Ackerson clearly has the requisite standing to challenge the agents' search of the home and we must therefore address the propriety of their actions as these actions relate to him.

## B. THE SEARCH

■ In this case, the district court held that the agents did not transgress Ackerson's Fourth Amendment rights at the door of Ackerson's house. The district court concluded that with reasonable suspicion, the agents were authorized under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) to detain the defendants for questioning "notwithstanding the possibility of a technical trespass." The district court misapplied *Terry.* In that case, the Supreme Court held that it was constitutional for a police officer to stop a suspect in the street for questioning and a possible frisk when the officer has a "reasonable suspicion" that such action is necessary. The *Terry* analysis does not apply to intrusions into the home, however, because an individual's residence enjoys special protection under the Fourth Amendment. *See Arizona v. Hicks,* 480 U.S. 321, 328, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987) (officer must have probable cause to search residence); *United States v. Davis,* 423 F.2d 974, 977 (5th Cir.), *cert. denied,* 400 U.S. 836, 91 S.Ct. 74, 27 L.Ed.2d 69 (1970)

(person's home holds favored position in list of those areas protected from unreasonable searches and seizures). Instead, we require that an officer have probable cause before searching someone's home and even then the officer may proceed only with a warrant or under exigent circumstances. *Hicks*, 480 U.S. at 328, 107 S.Ct. at 1154; *Coolidge v. New Hampshire*, 403 U.S. 443, 954–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

■ Thus, the threshold question in this case is whether the agents conducted a search within the purview of the Fourth Amendment when they smelled the marijuana through the open door of Ackerson's house. The resolution of this inquiry depends on whether the agents' conduct at the door amounted to a demand of entry under color of authority. If so, then Ackerson could not have consented to allow the agents either visual or olfactory access to the house because, "[w]here there is coercion, there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Without consent, the agents would not have gained access to Ackerson's house for any justifiable purpose and their entry would amount to a search. *See Vicknair*, 610 F.2d at 377. With reasonable suspicion, however, an officer may legally approach the house of a criminal suspect in order to make general inquiries. *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964); *United States v. Knight*, 451 F.2d 275, 278 (5th Cir.1971), *cert. denied*, 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972). As long as the door is not opened in response to a threat or a command, the actions of the agents are considered part of an investigation and not a "search." Thus, if the agents merely requested to speak with the occupants of the house and Ackerson opened the door in compliance, no search occurred at that point and any contraband detected by the agents' olfactory access into Ackerson's home was lawfully obtained under the "plain view" doctrine. *Coolidge*, 403 U.S. at 465–71, 91 S.Ct. at 2037–41.

Whether Ackerson voluntarily opened the door is a question of fact that must be determined from the totality of the circumstances. *Scneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). While neither Ackerson nor Tobin testified as to whether Ackerson opened the door voluntarily, all of the agents did testify as to the circumstances surrounding their initial entry into the house. No factual dispute exists over what happened. In such a situation, as long as the record is adequate, the district court's failure to address the question of consent does not prevent us from passing on the issue. *Cf. Miller*, 821 F.2d at 559–50 (appellate court decided issue of consent based on record); *United States v. Newbern*, 731 F.2d 744, 748 (11th Cir.1984) (appellate court first to pass on issue of consent); *United States v. Walters*, 591 F.2d 1195, 1200 (5th Cir.), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979) (appellate court first to pass on issue of consent). Instead, we may decide the question based on the officers' conduct. If the officers demanded entry under color of authority, there can be no consent as a matter of law. *United States v. Winsor*, 846 F.2d 1569, 1573 n. 3 (9th Cir.1988); *see also Bumper*, 391 U.S. at 550, 88 S.Ct. at 1792 (where there is coercion, there cannot be consent).

On the one hand, FBI agents shouting "police, open up," with or without guns drawn, is clearly a "forcible" entry in which the defendant has no choice but to acquiesce. Thus, in *United States v. Edmonson*, 791 F.2d 1512 (11th Cir.1986), we found that the appellant did not consent to being arrested within his residence when an official show of authority prompted his consent to the officers' entry. The agents blocked the exits to the appellants' apartment building and one agent shouted "FBI; open up!" Although there was no direct evidence that the appellant ever saw the FBI agents draw their guns, the appellant did see FBI agents both at his door and at the bottom of the stairs in his apartment complex. We found this enough to amount to a demand of entry.

We also found a lack of consent to entry in *Newbern*, 731 F.2d 744. In that case, the police knocked on the appellant's hotel door and the appellant pulled back the curtain of his window to see who was knocking. He then saw the officers with their badges out and their guns drawn. We found that "[t]he fact that [the appellant] then told the officers to come in, under such circumstances, cannot be termed entry based on consent." *Id.* at 748.

On the other hand, where the police ask for entry in a non-threatening manner and ask merely to speak to the suspect, the occupant is complying with a request that any public member could make, and opening the door is generally considered voluntary. For example, we found that the appellant voluntarily consented to the officers' entry into the appellant's hotel room in *United States v. Willis*, 759 F.2d 1486 (11th Cir.1985). In that case, the officer first telephoned the appellant's motel room and asked the appellant if they could talk "face-to-face." The appellant agreed, opened the door when the officer knocked, and said "come in." *Id.* at 1493, 1498.

■■■ The situation in the present case lies somewhere between the polar examples mentioned above. In this case, the agents went to the door and, after initially receiving no answer, continued to knock for three to four minutes. Agent Roberts shouted in both English and Spanish that he was a police officer, that he wanted to talk to the appellants and that he needed the appellants to come to the door. Ackerson finally opened the door and stepped back. Under these circumstances, the situation is most analogous to the Supreme Court case of *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) and this circuit's case of *United States v. Pekar*, 315 F.2d 319 (5th Cir.1963).

In *Johnson*, the Supreme Court held that the police effected an unlawful search when they followed up on a tip that someone in a hotel room was smoking opium. Once they identified the odor as coming from a specific room, they knocked on the door. The occupant asked who was there and one of the officers answered "Lieutenant Belland." After some shuffling, the occupant answered the door and the lieutenant stated that he wanted to talk to the occupant "a little bit." The occupant then stepped back and admitted the officers. The Supreme Court specifically found that "[e]ntry into defendant's living quarters, which was the beginning of the search, was demanded under color of office." *Id.* 333 U.S. at 13, 68 S.Ct. at 368.

Similarly in *Pekar*, the FBI was notified that luggage had been stolen from an airplane. Upon investigation, the agents believed that the suspect had gone into a certain hotel and the agents located his room. At this point, however, the agents had only reasonable suspicion to investigate and not probable cause. The agent knocked on the door and the suspect asked who was there. The agent replied that he was an FBI agent and that he wanted to talk to the suspect about an official investigation. The suspect did not answer and about ten minutes later the agent knocked again. This time the suspect asked how he could be sure that the man was really an FBI agent and the agent showed him his credentials through the open louvers. The suspect then let the agents in and gave them permission to search his room. This court held that in this situation the suspect had been impliedly coerced into submitting to a search of his hotel room. We found the agents created "an aura of officialdom," and along with the defendant's refusal to sign a warrant waiver, this show of authority rendered the entry unconstitutional.[1]

■■■ We find that the agents in this case demanded entry under "color of authority." Agent Roberts knocked too long and too adamantly to put him in the category of any other public member asking for entry. The agent's shouting for three or four minutes that he was a police officer and that "he needed the appellants to come

---

1. We wish to emphasize that our holding in this case does not suggest that police officers cannot identify themselves as such and seek admission into a home without such conduct constituting coercion.

here," does not, under the totality of the circumstances, amount to a request. The magic words of demand such as "open-up," are not necessary to constitute coercion. Rather, it is the actions of the officers and the context in which the words are spoken that disposes of the issue. *See Walters*, 591 F.2d at 1200 ("request" that appellant follow agent was no more than rhetorical question). In this case, three unmarked vehicles pulled up curbside to Ackerson's property. Three agents got out of the vehicles and went up to Ackerson's house. Two of the agents purposefully positioned themselves as "back-up" to the agent knocking on the door, with one of the agents standing near the front door and the other agent "hiding" with his gun drawn. Agent Roberts knocked and shouted for at least three to four minutes. Furthermore, we note that Ackerson never verbally agreed to allow the agents to enter or to search the garage. Ackerson's actions in this regard further support the idea that Ackerson was reacting to the agents rather than consenting. *Cf. Johnson*, 333 U.S. at 12, 68 S.Ct. at 368 (defendant "stepped back acquiescently"); *Pekar*, 315 F.2d at 325 (defendant seemed "confused"). Because the agents demanded entry under color of authority, they effected a search of Ackerson's house when they gained olfactory access through the open door.

A survey of the cases in other circuits does not alter our conclusion. In the Ninth Circuit, for example, the court held in *Davis*, 327 F.2d 301, that the door was voluntarily opened upon request when the appellant's eight year old daughter invited the officer into the house. The officer was a plain clothes police officer who knocked on the door to question the appellant about certain drug deals in which the appellant had been implicated. When the girl opened the door, the officer asked if he could speak to the appellant and the girl let him in. In contrast, in *Winsor*, 846 F.2d at 1573, the Ninth Circuit held, in an *en banc* decision, that the appellant did not consent to entry of police officers when the officers knocked on the door, identified themselves and demanded that the door be opened. The distinctions made in these two opinions

are consistent with our resolution of the present case.

Furthermore, the situation presented here is distinguishable from that in the two cases from other circuits relied upon by the government, *Robbins v. Mackenzie*, 364 F.2d 45 (1st Cir.), *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966) and *United States v. Griffin*, 530 F.2d 739 (7th Cir.1976). In *Robbins*, only one officer knocked on the door and he knocked only once. The officer identified himself and said he wished to talk to the suspect. The suspect opened the door. The suspect did not attempt to ignore the officer nor did the officer repeatedly tell the suspect that "he needed for him to come here." In addition, only one officer was present and no vehicles pulled up to the house. Likewise, in *Griffin*, 530 F.2d at 743–44, the suspect said no the first time the officers knocked on the door and requested entry. The suspect then shut the door in the officers' face. The officers knocked again a few minutes later to inform the suspect that a co-suspect had been caught fleeing the apartment. Upon learning of this development, the suspect allowed the officers in. The court held that this second request was not coercive because the officers fully informed the suspect of the reason for their continued presence *before* gaining entry into the apartment. In the present case, Ackerson did not know the nature of the officers' visit until after he had opened the door and they had already gained entry into his home.

In finding that the agents demanded entry, we are really deciding that the agents coerced Ackerson into opening the door. As discussed above, this finding forecloses the possibility that Ackerson acted voluntarily in allowing the agents access to his home. Under these circumstances, we find that the agents conducted a "search" of Ackerson's house. This conclusion is further supported by the agents' testimony concerning the purpose of their visit. Agent Roberts testified that he went to the door "to determine—talk to the people in the house to ask them what they had put in

the garage." Agent Widener was more explicit:

Q. Now you said that in your opinion three agents was a small number of agents to approach the house?

A. Yes, sir.

Q. Why?

A. Well, for security, safety reasons we would generally conduct a search with five, six, seven agents.

Q. So the normal course of action would be to use five or six agents for a search rather than three?

A. Yes, sir.

Q. And you would have now felt more comfortable doing this with five or six agents?

A. Yes, sir.

Q. And I think you also said you wanted more agents if you intend to do an arrest?

A. For safety, yes, sir.

Q. I take it you then had it in your mind at the time you approached the house that you may well be arresting somebody in the house?

A. Yes, sir.

    *    *    *    *    *    *

Q. What questions had you decided that Roberts was going to ask the occupant?

A. He was going to ask him what he had just taken out of the trunk of a car and put into the garage.

Q. Anything else?

A. Well, in response to that we were going to try to get a consent search.

Q. Did you discuss what would happen if you didn't get a consent search?

A. Not really.

Q. Had you made the decision that because this was narcotics that you'd better seize it anyway even without consent?

A. We did not discuss that, no.

Q. Did you think that?

A. I probably did, yes, sir.

    *    *    *    *    *    *

Q. Is there any doubt in your mind as you sit here today, Agent Widener, your purpose of going on to the premises of Mr. Ackerson's house was to search for criminal activity?

A. No, no doubt in my mind.

Q. That's why you were there, wasn't it?

A. That's right.

R–6–31, 34, 86.

■ While the inquiry we make is whether the agents coerced Ackerson into opening the door, we note that the agents' subjective intent in entering private property is a relevant factor in determining whether an illegal search has occurred. *See, e.g., Vicknair*, 610 F.2d at 377 (admittedly illegal purpose of searching a boat coupled with attempts to observe interior of house, belies officers' assertion that they went onto property to locate owner); *Knight*, 451 F.2d at 278–79 (crucial inquiry in determining whether search illegal is officer's purpose for entering private property); *Davis*, 423 F.2d at 977 (illegal search where officers went to home for sole purpose of finding pistol); *Davis*, 327 F.2d at 303 (no rule which makes it illegal *per se* for officer peaceably to walk up and knock on house with honest intent of asking questions of the occupant). Here, at least one of the agents admitted that the agents approached the door for the express purpose of finding what was in the garage and of making a possible arrest. That the agents hoped consent would be given does not obscure the fact that they intended to gain access to the house in any event.

In sum, case law supports our conclusion that the agents in this case demanded entry under color of authority. Thus, once Ackerson opened the door, the agents were in a position in which they had no right to be. *Davis*, 423 F.2d at 977. Under these circumstances, the agents "obtained" the smell of marijuana through a warrantless search of Ackerson's home. In order to justify this warrantless search, the agents' level of suspicion should have been one of probable cause accompanied by exigent circumstances that required the agents to act quickly.

■ In this case both the magistrate and the district court held that the agents

**332**

did not have probable cause when they approached the house and that probable cause did not exist until the agents smelled the marijuana after Ackerson opened the door. Without probable cause, the search of Ackerson's house, which began at the door, was illegal. Furthermore, any exigent circumstances that existed by virtue of the appellants' knowledge that they had been discovered were circumstances created by the government. The government cannot justify a warrantless search based on exigent circumstances of its own making. *United States v. Munoz–Guerra,* 788 F.2d 295, 298 (5th Cir.1986). In the present case, the agents could have maintained surveillance until they obtained more evidence. If a car pulled up to take the suspected drugs away, the agents could have easily detained the driver. Therefore, the whole search was illegal and cannot be cured by any subsequent consent or need to act based on exigent circumstances. Consequently, with respect to Ackerson, any evidence found in the search of Ackerson's garage, the security sweep of the house and the search of the car must be suppressed as the fruits of the ongoing, illegal search. *See United States v. Robinson,* 690 F.2d 869, 877–78 (11th Cir.1982).

### III. CONCLUSION

Because the agents created an "aura of officialdom" and demanded that Ackerson open the door, the agents in this case effected a search within the purview of the Fourth Amendment when Ackerson acquiesced to this demand. This search was effected without consent and without probable cause. Although the subsequent search of the garage and car and the security sweep were all undertaken with probable cause, this probable cause was illegally obtained. Thus, all of the evidence seized in these searches must be suppressed as to Ackerson. Because Tobin lacks standing to challenge the propriety of the agents' search and seizure actions, none of the seized evidence is suppressible as to him. The district court's order is therefore

AFFIRMED IN PART and REVERSED IN PART and the case REMANDED for further proceedings.